**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 27, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

v.

RICK GLEN STRANDLOF,

      Defendant-Appellee.

and

THE AMERICAN LEGION,

      Amicus Curiae.

and

CHRISTOPHER GUZELIAN,

      Amicus Curiae.

No. 10-1358

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 09-CR-00497-REB)**

---

Joseph F. Palmer, United States Department of Justice, Criminal Division, Appellate Section, Washington, District of Columbia (John Walsh, United States Attorney, and Michael C. Johnson, Assistant United States Attorney, United States Attorney's Office, Denver, Colorado, with him on the briefs), for Appellant.

John T. Carlson, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, and O. Dean Sanderford, Research and Writing Specialist, with

him on the brief) Office of the Federal Public Defender, Denver, Colorado, for Appellee.

Van H. Beckwith, Ryan L. Bangert, and Russell W. Fusco, Baker Botts L.L.P., Dallas Texas, and Aaron M. Streett, Baker Botts L.L.P. Houston, Texas, and Philip B. Onderdock, Jr., National Judge Advocate, The American Legion, Indianapolis, Indiana, on the brief for Amicus Curiae The American Legion in support of Appellant.

Christopher Guzelian, San Diego, California, on the brief for Amicus Curiae Christopher Guzelian in support of Appellee.

_____

Before **TYMKOVICH**, **BALDOCK**, and **HOLMES**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

Appellant Rick Strandlof was charged under the Stolen Valor Act, 18 U.S.C. § 704(b), which makes it illegal to falsely claim to have received a military award or honor. We must decide whether the Act is constitutional. Answering this question requires us to determine whether, and to what extent, the First Amendment prohibits Congress from punishing knowingly false statements of fact.

Reasoning that false statements are generally protected by the First Amendment, the district court declared the Stolen Valor Act unconstitutional and dismissed the charges against Strandlof. We disagree with this reading of Supreme Court precedent and reverse. As the Supreme Court has observed time and again, false statements of fact do not enjoy constitutional protection, except

-2-

to the extent necessary to protect more valuable speech. Under this principle, the Stolen Valor Act does not impinge on or chill protected speech, and therefore does not offend the First Amendment.

## I. Background

### A. The Statute

The Stolen Valor Act provides:

> Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.

18 U.S.C. § 704(b). The Act provides for jail terms of up to six months for most misrepresentations and up to a year for false statements that a person has received the Congressional Medal of Honor or other specified awards. *Id.* § 704(d).

### B. Strandlof's Prosecution

Over a multi-year period, Appellant Rick Strandlof concocted a ruse that plainly put him in the cross-hairs of the Stolen Valor Act. Despite never having served in the armed forces, Strandlof founded the Colorado Veterans Alliance, and he frequently told veterans he graduated from the United States Naval Academy, was a former U.S. Marine Corps Captain, and had been wounded in combat in Iraq. He bragged of receiving a Purple Heart, which is given to

soldiers wounded or killed in action, and he boasted that he had been awarded the Silver Star for gallantry in battle. For example, while attending a planning meeting for a luncheon to solicit donations for veterans, Strandlof falsely claimed to have received a Purple Heart. At veterans gatherings, Strandlof used the alias "Captain Rick Duncan," and he created online profiles where he claimed to have graduated from the Naval Academy.

A number of local veterans found Strandlof to be an unconvincing imposter. Angered by Strandlof's lies, they contacted the FBI and reported their suspicion that "Rick Duncan" was a phony. After military officials confirmed Strandlof never attended the Naval Academy or served in the military, the government filed a criminal complaint in the District of Colorado charging Strandlof with making false claims about receipt of military decorations or medals, in violation of the Stolen Valor Act.

Strandlof pleaded not guilty and moved to dismiss the charges. Represented by a federal public defender, he argued the Stolen Valor Act is unconstitutional under the First Amendment, both facially and as applied to him, because it is a content-based restriction on speech. Rejecting the government's argument that false speech is unprotected under the First Amendment, the district court found the Act facially unconstitutional and granted Strandlof's motion. *United States v. Strandlof*, 746 F. Supp. 2d 1183, 1185 (D. Colo. 2010). The court held that false speech is protected by the First Amendment unless it falls

within one of the narrow categories of speech that have been historically recognized as exceptional, such as fraud or defamation. *Id.* at 1186–88. The district court further held the speech criminalized by the Stolen Valor Act was analogous neither to fraud nor defamation, and that it could not be shoehorned into any of the other historical categories. *Id.* The district court therefore characterized the Act as a content-based regulation of protected speech and held that it did not survive strict scrutiny. *Id.* at 1189–91.

## C. *Other Stolen Valor Act Prosecutions*

Other courts have confronted this same question, with varying results.[1] In *United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010), the only circuit court

---

[1] The broader question of the constitutionality of knowing falsehoods has also inspired significant scholarly debate, with no clear consensus. *See, e.g.*, Frederick Schauer, *Facts and the First Amendment*, 57 UCLA L. Rev. 897 (2010); Steven G. Gey, *The First Amendment and the Dissemination of Socially Worthless Untruths*, 36 Fla. St. U. L. Rev. 1 (2008); Jonathan D. Varat, *Deception and the First Amendment, A Central, Complex, and Somewhat Curious Relationship*, 53 UCLA L. Rev. 1107 (2006); James Weinstein, *Speech Categorization and the Limits of First Amendment Formalism: Lessons from* Nike v. Kasky, 54 Case W. L. Rev. 1091 (2004); Kenneth Lasson, *Holocaust Denial and the First Amendment: The Quest for Truth in a Free Society*, 6 Geo. Mason L. Rev. 35 (1997); Charles Fried, *The New First Amendment Jurisprudence: A Threat to Liberty*, 52 U. Chi. L. Rev. 225 (1992); Mark Tushnet, *'Telling Me Lies': The Constitutionality of Regulating False Statements of Fact*, Harv. Pub. L. Working Paper No. 11-02 (2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1737930; Josh M. Parker, *The Stolen Valor Act as Constitutional: Bringing Coherence to First Amendment Analysis of False Speech Restrictions*, 78 U. Chi. L. Rev. — (Forthcoming 2011); Jeffrey C. Barnum, *Protecting the Public by Protecting Valor: The Case for Amending the Stolen Valor Act to be an Anti-Fraud Measure*, 86 Wash. L. Rev. — (Forthcoming 2011).

case to consider this issue, a divided Ninth Circuit panel held the Stolen Valor Act is facially unconstitutional.[2] The majority opinion found that "false factual speech, as a general category unto itself," does not fall within those "historical and traditional categories [of unprotected speech] long familiar to the bar." *Id.* at 1206 (quotation omitted). Specifically, the court reasoned that the Stolen Valor Act does not "fit[] into the defamation category" of unprotected speech, because it does not prohibit only speech that is made with actual malice or knowledge of falsity and that is "injurious to a private individual." *Id.* at 1209 (quotation omitted). Thus, the Ninth Circuit applied strict scrutiny and concluded that, although the Stolen Valor Act serves an important interest (perhaps even a compelling interest), it is not narrowly tailored because "other means exist to achieve the interest of stopping [false speech regarding military awards], such as by using *more* speech, or redrafting the Act to target actual impersonation or fraud." *Id.* at 1211.

In a dissenting opinion, Judge Bybee concluded strict scrutiny was unnecessary because Supreme Court precedents established knowingly false statements of fact as a category of speech unprotected by the First Amendment. *Id.* at 1218–19 (Bybee, J., dissenting). In addition, several circuit judges wrote

---

[2] In addition, the Eighth Circuit recently considered an analogous question—the constitutionality of a state statute prohibiting false statements about ballot initiatives—and held knowingly false campaign speech is not a category of unprotected speech. *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011).

concurring or dissenting opinions to the Ninth Circuit's subsequent, narrowly divided, order denying rehearing.  The Supreme Court granted a writ of certiorari to review *Alvarez*.[3]  *United States v. Alvarez*, — S. Ct. —, No. 11-210, 2011 WL 3626544 (U.S. Oct. 17, 2011).

District courts considering the question have reached varying conclusions. Like the Ninth Circuit and the District of Colorado, the Southern District of Iowa concluded the Stolen Valor Act is an unconstitutional content-based restriction on speech.  *United States v. Kepler*, No. 4:11-cr-00017 (S.D. Iowa May 31, 2011) (order).  Conversely, in *United States v. Robbins*, 759 F. Supp. 2d 815 (W.D. Va. 2011), the Western District of Virginia concluded false statements of fact are not constitutionally protected and upheld the Act.

Appeals involving the constitutionality of the Stolen Valor Act are pending in the Eighth and Eleventh Circuits.  *See United States v. Kepler*, No. 11-2278 (8th Cir. 2011); *United States v. Amster*, No. 10-12139 (11th Cir. 2011).

## II.  Discussion

The sole question presented is whether the Stolen Valor Act, a content-based restriction on speech, is facially constitutional.  We find it is and reverse

---

[3]  The government suggested we stay this case while the Supreme Court reviews *Alvarez*.  Strandlof urged us to decide the case.  Our practice as a court has been to decide cases that are ripe even while parallel cases are under review by the Supreme Court.  *See, e.g.*, *United States v. Story*, 635 F.3d 1241 (10th Cir. 2011); *In re Dawes*, 652 F.3d 1236 (10th Cir. 2011); *United States v. West*, 550 F.3d 952 (10th Cir. 2008).

the district court's decision. As the Supreme Court has repeatedly asserted, the Constitution does not foreclose laws criminalizing knowing falsehoods, so long as the laws allow "breathing space" for core protected speech—as the Supreme Court calls it, "speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) (applying *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)). As we show, under this legal framework, the Stolen Valor Act survives scrutiny because (1) it restricts only knowingly false statements of fact, and (2) specific characteristics of the statute, including its mens rea requirement, ensure it does not overreach so as to chill protected speech.

In the next section, we review the specifics of the Act, analyze what the Supreme Court has and (as importantly) has not said about legislative restrictions on false statements of fact, and survey past legislative efforts to regulate in this area.

### A.    *Legal Background*

### 1.    The Stolen Valor Act

Since America's founding, penalties have been imposed for wearing unauthorized military medals. *General Orders of George Washington Issued at Newburgh on the Hudson, 1782–1783*, at 34–35 (Edward C. Boynton ed., 1883) (reprint 1903) ("Should any who are not entitled to the [military] honors have the insolence to assume to the badges of them, they shall be severely punished."); *see also Alvarez*, 617 F.3d at 1234 (Bybee, J., dissenting). And since 1949, 18 U.S.C.

§ 704(a) has made it illegal to wear, manufacture, or sell unauthorized military awards. In recent years, during the Afghanistan and Iraq wars, Congress judged prior laws insufficient to deter false statements regarding military decorations, s*ee, e.g.*, 151 Cong. Rec. S12,688 (daily ed. Nov. 10, 2005) (statement of Sen. Conrad), and Congress responded in 2006 by passing the Stolen Valor Act, 18 U.S.C. § 704(b). In doing so, Congress found, among other things, that false statements regarding military honors effect harm by "damag[ing] the reputation and meaning of [] decorations and medals." Stolen Valor Act of 2005, Pub. L. No. 109-437, § 2(1), 120 Stat. 3266 (2006). According to Congress, the legislation was necessary "to permit law enforcement officers to protect the reputation and meaning of military decorations and medals." *Id.* § 2(3).

The restrictions in the Stolen Valor Act are specifically aimed at one category of speech—lies about military honors. Given this focus, the Act is a content-based restriction on speech. Under the plain terms of the Act, if someone pontificating on a street corner falsely (and with knowledge of the falsehood) proclaims to be a decorated veteran, he has committed a criminal act. It is inconsequential whether the lie induced reliance or caused discrete harm.[4]

---

[4] In May 2011, Representative Joseph Heck introduced a congressional resolution, which amends the Stolen Valor Act to add a requirement that, to violate the act, misrepresentations must be made "with intent to obtain anything of value." H.R. 1775, 112th Cong. (2011). This resolution, which would expressly transform the Act into a fraud statute, was referred to subcommittee in June 2011.

Despite the potential breadth of the statute, however, it has limits. The Supreme Court requires we read an act of Congress narrowly, so as to avoid constitutional problems. We "will . . . not lightly assume that Congress intended to infringe constitutionally protected liberties." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Accordingly, we find the Act is limited in two important ways.

First, the term "falsely represents," as used in § 704(b), connotes that to be guilty, a speaker must have had a specific *intent to deceive*. *See, e.g.*, *Black's Law Dictionary* 1091 (9th ed. 2009) (a "false representation," also known as a "misrepresentation," is "[t]he act of making a false or misleading statement about something, usu[ally] with the intent to deceive"); *see also United States v. Perelman*, 658 F.3d 1134, 1138 (9th Cir. 2011) (holding the provision of the Stolen Valor Act that bars the unauthorized wearing of medals, § 704(a), should be interpreted as limited to situations where the wearer "has an intent to deceive").[5] Therefore, we find § 704(b) contains a scienter element, which

---

[5] The dissent finds an intent to deceive requirement at odds with the statute. But such a requirement follows naturally from the text's emphasis on *false representations*, of which intent to deceive is naturally a part. The Stolen Valor Act does not compel the expansive reading the dissent provides. Rather,

(continued...)

-10-

operates to criminalize only knowingly false statements about receiving military awards. This interpretation aligns with the presumption that criminal statutes contain an implied mens rea requirement. *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 605–06 (1994); *Morissette v. United States*, 342 U.S. 246, 250 (1952). Thus, the Act does not punish unwitting lies about military awards.

Second, the Stolen Valor Act does not criminalize any satirical, rhetorical, theatrical, literary, ironic, or hyperbolic statements that qualify as protected speech. *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam) (interpreting prohibition on knowingly making "any threat" to harm the President as excluding "political hyperbole" in the absence of any evidence of contrary congressional intent). The Act's requirement that false statements be made with an intent to deceive, as we explain below, would not allow the government to prosecute individuals for making ironic or other artistically or politically motivated statements. *Black's Law Dictionary* 1415 (a "representation" is a "presentation of fact").

We thus disagree with the suggestion that upholding the Stolen Valor Act would lead America down a slippery slope where Congress could criminalize an appallingly wide swath of ironic, dramatic, diplomatic, and otherwise polite speech. *See, e.g.*, *United States v. Alvarez*, 638 F.3d 666, 684 (9th Cir. 2011)

---

[5](...continued)
the Act is aimed at the "*deceptive* use of military medals," i.e., that "deception was the targeted harm." *Perelman*, 658 F.3d at 1137 (emphasis in original).

(Kozinski, C.J., concurring in the denial of rehearing en banc) (cataloguing various colorful, everyday utterances that legislatures could conceivably criminalize if the Stolen Valor Act is upheld).  Indeed, just because Congress can criminalize some lies does not imply it can attack opinions (e.g., "You look beautiful today"), ideologically inflected statements (e.g., holocaust denial or climate change criticism), or anything else that is not a knowingly false factual statement made with an intention to deceive.[6]

Read with these two limitations, only outright lies—not ideas, opinions, artistic statements, or unwitting misstatements of fact—are punishable under the Act.  With this in mind, we consider the constitutional framework.

## 2.    Constitutional Framework

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.

Despite this plain language, little historical consensus exists as to the original public meaning of this clause, in part because the framers apparently did not envision that Congress would actively regulate speech.  *See* Akhil Reed Amar,

---

[6] And of course, the judiciary will continue to scrutinize arbitrary and irrational legislative enactments.  Moreover, we expect that, just as they have for centuries, legislative majorities will continue to exercise judgment—constitutional as well as practical—and refrain from enacting outrageous laws that encroach upon the ability of individuals to voice their opinions, converse with fellow citizens, and go about their lives.  If a legislature were to attempt to ban innocuous "white lies," we would likely have already traveled far down a path of tyranny in other, more significant, areas.

*How America's Constitution Affirmed Freedom of Speech Even Before the First Amendment*, 38 Cap. U. L. Rev. 503, 504 (2010).  It is clear, however, that, "[t]he framing-era conception of freedom of speech and the press was anything but capacious, at least by contemporary standards."  Lawrence Rosenthal, *First Amendment Investigations and the Inescapable Pragmatism of the Common Law of Free Speech*, 86 Ind. L.J. 1, 13 (2011); *see also* Frederick Schauer, *Facts and the First Amendment*, 57 UCLA L. Rev. 897, 904 (2010) (observing that initially, "[c]ampaigns for increased freedom of speech . . . were largely about the claimed right to criticize . . . the government . . . but it was scarcely even suggested that freedom of speech encompassed the right to articulate factually false propositions").  Indeed, it took Congress only a few years to pass the Sedition Act of 1798, 1 Stat. 596, which made it a crime to "write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress . . ., or the President . . ., with intent to defame . . . or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States."  *See also New York Times*, 376 U.S. at 273–74 (describing the content and import of the Sedition Act).  While the Sedition Act was never formally tested in the Supreme Court (it expired on March 3, 1801, the day before President Adams's presidential term ended), the Act has long been recognized as unconstitutional.  *See, e.g. id.* at 276 ("Although the Sedition Act

was never tested in this Court, the attack upon its validity has carried the day in the court of history."); Act of July 4, 1840, c. 45, 6 Stat. 802, *accompanied by* H.R. Rep. No. 86, 26th Cong., 1st Sess. (1840) (repaying fines levied in Sedition Act prosecutions on the ground that the Act was unconstitutional). And it was not until the 1920s and 1930s, in cases involving prosecutions for allegedly seditious political activity, that the Supreme Court first invoked liberty interests inherent in the Fourteenth Amendment's due process clause to reverse criminal convictions based on speech. *See, e.g.*, *Fiske v. Kansas*, 274 U.S. 380 (1927); *Stromberg v. People of State of Cal.*, 283 U.S. 359 (1931); Amar, *supra*, at 504.

Over time, however, free speech doctrine has evolved to reflect a broad and principled conception of the First Amendment. "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. '[T]he freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole.'" *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–51 (1988) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503–04 (1984)). "[A]s a general matter, . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (quotation marks omitted). And in most cases, a content-based restriction on

-14-

speech can withstand a First Amendment attack only if it satisfies strict scrutiny—that is, only if the challenged legislation is narrowly drawn to serve a compelling governmental interest. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992).

Given this case law, the Stolen Valor Act, a content-based restriction, is "presumptively invalid, and the government bears the burden to rebut that presumption." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000) (quotation omitted). And doubly so since the Act criminalizes the speech it condemns.

But despite the First Amendment's open-ended language, not all categories of speech receive full constitutional protection. The Supreme Court, in a long line of cases, has recognized Congress may regulate some types of speech without facing constitutional scrutiny. For example, in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942), the Supreme Court upheld a law prohibiting "fighting words," reasoning the Constitution does not afford shelter to words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." In doing so, the Court observed, "it is well understood that the right of free speech is not absolute at all times and under all circumstances." *Id.* at 571; *see also Gertz*, 418 U.S. at 382 (White, J., dissenting) (the framers recognized, "in any well-governed society, the legislature has both the right and the duty to prohibit certain forms of speech" (quotation omitted)). As Justice Story, one of

-15-

our most respected constitutional scholars, recognized, the First Amendment is not made of absolutes: it was never "intended to secure to every citizen an absolute right to speak, or write, or print, whatever he might please"; to think so "is a supposition too wild to be indulged by any rational man."  Joseph Story, *Commentaries on the Constitution* 703 (1833).  Similarly, Thomas Cooley, perhaps the leading constitutional scholar of the Reconstruction Era, suggested the First Amendment protects expression only "so long as it is not harmful in its character, when tested by such standards as the law affords."  Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 421 (1868).  While these conceptions of the First Amendment are quaint by today's standards, they frame the historical context of our narrow inquiry: whether false statements of fact are entitled to blanket First Amendment protection.

### 3. Knowingly False Statements of Fact

Since the 1960s, the Supreme Court has repeatedly declared that knowingly false statements of fact, as a category of speech, are not generally entitled to full First Amendment protection.  As the Court recently confirmed, protection of false statements is derivative of the need to ensure that false-speech restrictions do not chill valuable speech.  "[W]hile false statements may be unprotected for their own sake, the First Amendment requires that we protect some falsehood in order to protect *speech that matters*."  *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 531

(2002) (quotation omitted). Thus, so long as legislatures avoid unduly chilling speech that matters, they have room to regulate false statements of fact.

This approach to false-statements legislation traces back to three Supreme Court cases involving defamation: *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Garrison v. Louisiana*, 379 U.S. 64 (1964); and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). These cases and the cases that follow teach us that false statements of fact are generally unprotected—but with a caveat. The Court has recognized that false-speech restrictions may violate the First Amendment when they are so suffocating as to afford inadequate breathing space for constitutionally valuable speech.

In fleshing out this doctrine, we start with the celebrated case of *New York Times Co. v. Sullivan*, 376 U.S. at 280–84. There, the Supreme Court set forth a framework for applying the First Amendment to states' abilities to punish defamatory falsehoods. In striking down an aspect of Alabama's defamation law, the Court held the First Amendment (and Fourteenth Amendment)[7] permits state legislatures to impose liability for making a defamatory statement regarding a public official only if the "public official . . . proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80. This holding was based

---

[7] Earlier Supreme Court cases upheld libel statutes under the Fourteenth Amendment. *See, e.g., Beauharnais v. People*, 343 U.S. 250 (1952).

on the Court's reasoning that because "erroneous statement is inevitable in free debate,. . . it must be protected if the freedoms of expression are to have the '*breathing space*' that they need . . . to survive." *Id.* at 271–72 (quotations and alterations omitted) (emphasis added). The Court recognized the danger that a strict liability or negligence standard could chill constitutionally protected speech by silencing speakers seeking to avoid malicious prosecution or jury misunderstanding. Protecting *some* false utterances—those made without malice or on matters of private concern—was the only way to avoid deterring a range of truthful statements that benefit public discourse. Implicit in the Court's analysis, however, was the understanding that false statements, standing alone, lack elemental constitutional value, and public discourse is not diminished when a speaker is deterred from making a false statement of fact.

Just a few months after *New York Times*, the Supreme Court applied these principles in *Garrison v. Louisiana*. In that case, the Court recognized expressly that knowingly false statements are not entitled to full First Amendment protection:

> Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. That speech is

used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution.

The Court went on to proclaim:

> For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. *Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.*

*Garrison*, 379 U.S. at 75 (emphasis added) (citation, quotation marks, and alterations omitted).

Ten years later, in *Gertz v. Robert Welch*, the Supreme Court reiterated, in perhaps even plainer terms, that false statements of fact receive limited shelter from the First Amendment:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in uninhibited, robust, and wide-open debate on public issues. They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' [*Chaplinsky*, 315 U.S. at 572.] . . . *[T]he erroneous statement of fact is not worthy of constitutional protection.*

418 U.S. at 339–40 (citation and quotation marks omitted) (emphasis added).  In line with the breathing space principle enunciated in *New York Times*, the Court recognized false statements of fact are "inevitable in free debate . . . [a]nd punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press."  *Id.* at 340.  Therefore, the Court explained, "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters."  *Id.* at 341.  And the Court also noted that, if a law provides breathing space but chills some speech, the law is constitutional only if it "reach[es] no farther than is necessary to protect the legitimate interest involved."  *Id.* at 349.

Thus, the Supreme Court has expressly stated that, although laws punishing false statements must afford adequate breathing space to protected speech, knowingly false factual statements are not intrinsically protected under the First Amendment.  The theoretical basis for this classification is based on the understanding that "[f]alse statements of fact are particularly valueless [because] they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective."  *Hustler Magazine*, 485 U.S. at 52.  In other words, knowingly false statements, in contrast even to incendiary ideas, are no part of the "the common quest for truth and the vitality of society as

-20-

a whole." *Id.* at 51. Just because controversial *ideas* and *opinions* merit constitutional protection does not mean false *facts* deserve the same immunity.

In summary, *New York Times*, *Garrison*, and *Gertz* require a three-part inquiry. First, we must assess whether a law punishes only *knowingly* false statements. If this is the case, the court must then decide whether the law leaves adequate "breathing space" for truthful and other fully protected speech. And if a statute survives both of these inquiries but still chills some speech, it is constitutional so long as it reaches no further than necessary to protect the government's legitimate interest.

The breathing space approach set forth in these cases remains good law and is binding on us. Further, *New York Times*, *Garrison*, and *Gertz* are not anomalous constitutional outliers. In fact, consistently over the past five decades—in cases involving defamation, libel, commercial speech, intentional infliction of emotional distress, and other legislative areas—the Court has reiterated that false statements of fact receive minimal constitutional protection. *See, e.g.*, *BE&K Constr. Co.*, 536 U.S. at 530–31 ("[F]alse statements are not immunized by the First Amendment right to freedom of speech . . . ." (quotation omitted)); *Hustler Magazine*, 485 U.S. at 52 ("False statements of fact are particularly valueless . . . ."); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ("False statements of fact harm both the subject of the falsehood and the readers of the statement. . . . There is no constitutional value in false statements

-21-

of fact." (quotation omitted)); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech . . . ."); *Brown v. Hartlage*, 456 U.S. 45, 60–61 (1982) (false factual statements "are not protected by the First Amendment in the same manner as truthful statements" (citation omitted)); *Herbert v. Lando*, 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials. '[T]here is no constitutional value in false statements of fact.'" (quoting *Gertz*, 418 U.S. at 340)); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) ("Untruthful speech . . . has never been protected for its own sake."); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 499 n.3 (1975) (Powell, J., concurring) ("[T]he common premise [is] that while the Constitution requires that false ideas be corrected only by the competitive impact of other ideas, the First Amendment affords no constitutional protection for false statements of fact."); *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("[C]onstitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function.").

Most circuit courts have recognized these authorities and held that false statements of fact receive limited First Amendment protection. *See, e.g.*, *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 228 (3d Cir. 2004) ("[L]ies and untruthful statements are protected under First Amendment jurisprudence only in those rare instances where they contribute to the uninhibited marketplace of

ideas." (quotation omitted)); *Colson v. Grohman*, 174 F.3d 498, 507 (5th Cir. 1999) ("[I]ntentional or reckless falsehood, even political falsehood, enjoys no First Amendment protection."); *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 577 (6th Cir. 1991) ("[F]alse speech, even political speech, does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth."); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1089 (9th Cir. 2002) ("The First Amendment does not protect knowingly false speech."); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982), *overruled on other grounds by Mayle v. Felix*, 545 U.S. 644, 657–59 (2005) ("The first amendment has not been interpreted to preclude liability for false statements."); *Bennett v. Hendrix*, 325 F. App'x 727, 742 (11th Cir. 2009) ("[S]peech constitut[ing] a false factual assertion [] is not protected by the First Amendment."); *United States v. Capps*, 140 F. App'x 911, 913 (11th Cir. 2005) ("Capps had no First Amendment right to make a false statement.").

And most importantly, these principles extend well beyond the narrow context of defamation. Since *New York Times*, *Garrison*, and *Gertz*, courts have extended the "false statements of fact" exception to cover many categories of false-speech statutes, including laws punishing fraud, false-light invasion of privacy, intentional infliction of emotional distress through false statements, trade libel, perjury, unsworn false statements of fact made to governmental officials, impersonation of a governmental official, false claims regarding university

-23-

degrees and professional licenses, falsehoods in connection with political campaigns, falsehoods likely to provoke public panic, and falsehoods that are likely to lead to physical harm.  *See* Brief for Eugene Volokh & James Weinstein *Amici Curiae* Supporting Petitioner at 3–11, *United States v. Alvarez*, No. 11-210 (U.S. Dec. 7, 2011); Brief for Eugene Volokh *Amicus Curiae* Supporting Plaintiff at 1, *United States v. Strandlof*, No. 09-cr-00497 (D. Colo. Jan. 15, 2010).

Simultaneously, the breathing space standard of scrutiny first applied in *New York Times* has become the default approach in First Amendment challenges to laws regulating all categories of false statements of fact.  A restriction on knowingly false factual statements is constitutional so long as it has some limiting characteristic that prevents it from suppressing constitutionally valuable opinions and true statements.  The Supreme Court has applied this principle, either expressly or implicitly, in at least the following six contexts:[8]

- *Defamatory Falsehoods*.  For defamation actions involving public officials, liability is appropriate only if the plaintiff proves, by clear and convincing evidence, that false statements were made with knowledge or reckless disregard of their falsity, *New York Times*, 376 U.S. at 279–80.  Non-public individuals, however, need only show the defamatory statements were made negligently.  *Gertz*, 418 U.S. at 344.

- *Fraud*.  For fraud actions, liability is appropriate only if there are limiting elements such as scienter, materiality, and reliance.  *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 620 (2003).

---

[8]  For a thorough discussion of the following categories, see Brief for the United States, *United States v. Alvarez*, No. 11-210, at 21–28 (U.S. Dec. 1, 2011), and Brief for Eugene Volokh & James Weinstein, *Amici Curiae* Supporting Petitioner at 3–11, *United States v. Alvarez*, No. 11-210 (U.S.  Dec. 7, 2011).

- *False-Light Torts*.  For false-light tort actions, liability is appropriate only when someone knowingly makes false statements, reasonably understood as statements of fact, that inflict emotional distress, without defaming or invading privacy.  *Time, Inc.*, 385 U.S. at 385–91.  False-light torts cover even nondefamatory but offensive knowingly false statements about another person.  *See Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245 (1974).

- *Perjury*.  For perjury or fraudulent administrative filings, liability is appropriate only if the government shows the misrepresentation was willful, material, and uttered under circumstances in which the misrepresentation is designed to cause injury to the government or private interests.  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); *see also Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961).

- *Baseless Litigation*.  In a suit seeking damages as a result of baseless litigation, liability is appropriate only if the litigation is "both objectively baseless *and* subjectively motivated by an unlawful purpose."  *BE&K Constr. Co.*, 536 U.S. at 531 (quoting *Bill Johnson's Rest.*, 461 U.S. at 743) (quotation marks and citation omitted).

- *Intentional Infliction of Emotional Distress*.  In a suit by a public figure seeking to recover for intentional infliction of emotional distress, liability is appropriate only if there is a showing of actual malice.  *Hustler*, 485 U.S. at 53, 56.

Although the Supreme Court has never precisely delineated how much breathing space is necessary, these examples and associated cases reflect the Court's consistent application of principles from *New York Times*—the same principles we must apply here.

No recent, directly applicable Supreme Court case calls into question the long-established breathing space approach.  And, moreover, the Supreme Court has never suggested that breathing space analysis is appropriate only for historically unprotected categories of false speech.  To the contrary, the breathing

space inquiry applies *whenever* government regulates false speech. So regardless of whether the Stolen Valor Act has identifiable historical precedents, its survival turns only on whether it satisfies breathing space principles.

This conclusion is illustrated perhaps most succinctly by *Time, Inc. v. Hill*, 385 U.S. at 388–90, where the Supreme Court applied breathing space analysis to address a New York law giving public figures the right to sue for damages when false factual statements invaded their privacy by placing them in a false light. The Court adopted this approach despite expressly recognizing that, unlike defamation, the false-light tort did not arise out of a long historical tradition. *Id.* at 380–81 & n.3. To ensure adequate breathing space for protected speech, the Court held that to recover under a false-light theory, a plaintiff must prove a false statement was made knowingly or recklessly. *Id.* at 389–90.

The parties here disagree on the effect of the Supreme Court's two most recent First Amendment pronouncements—*United States v. Stevens*, 130 S. Ct. 1577 (2010), and *Brown v. Entertainment Merchants Association*, 131 S. Ct. 2729 (2011)—on the Court's longstanding approach to false-statement legislation. Strandlof argues these cases fundamentally disrupt the Court's prior approach—implicitly overruling a substantial body of Supreme Court case law.

A precise analysis of what *Stevens* and *Brown* say—and critically, what they *do not say*—reveals the flaw in Strandlof's argument. In *Stevens* and *Brown*, the Supreme Court addressed the constitutionality of legislation restricting films

-26-

portraying animal cruelty and violent video games, respectively.  In both cases, the Court recognized the existence of certain "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Stevens*, 130 S. Ct. at 1584 (citations and quotation omitted); *Brown*, 131 S. Ct. at 2734 (same); *see also Chaplinsky*, 315 U.S at 572 (noting the existence of unprotected categories of speech).

In *Brown*, the Court explained that these categories of unprotected speech are inflexible and preordained by our nation's history.  "[W]ithout persuasive evidence that a novel restriction on content is part of a long . . . tradition of proscription, a legislature may not revise the judgment [of] the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." *Brown*, 131 S. Ct. at 2734.  The Court cautioned lawmakers to think twice before crafting new, as-of-yet-unrecognized categories of unprotected speech—and it expressly foreclosed the adoption of a balancing test to determine whether speech is valuable enough to merit constitutional protection.  "[N]ew categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated." *Id.*  Accordingly, "[t]he First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *Stevens*, 130 S. Ct. at 1585.

In line with these principles, the Court has listed examples of unprotected classes of speech—including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—but the Court has never voiced an intention to craft a comprehensive and inflexible list of unshielded utterances. *See Stevens*, 130 S. Ct. at 1584. To the contrary, the Court has recognized that "[m]aybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law."[9] *Id.* at 1586. Based on this reasoning, in *Brown* the Court roundly rejected the government's efforts to craft a category of unprotected speech protecting minors from violent images through video games.

Importantly, the breathing space analysis explained above is not an "ad hoc balancing of interests" of the sort foreclosed by *Stevens*, 130 S. Ct. at 1585. Rather, breathing space analysis recognizes that false statements of fact are categorically unprotected for their own sake, and then asks courts to consider whether the challenged legislation impinges on or chills core speech. While this approach gives courts some discretion in deciding how much breathing space suffices, the approach is not a balancing test in any ordinary sense. Instead, this

---

[9] In the cases since *Chaplinski*, the Supreme Court has held that the historical categories *include* certain types of speech, including profanity, libel, fighting words, fraud, and incitement. The cases are not consistent, however, in listing the same categories—and regardless, the word "includes" typically is a term of *enlargement*, not of limitation. *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008).

analysis is more aptly characterized as a specific method of review the Court uses

to assess laws regulating false factual statements. Breathing space review is no

more of a balancing test than strict scrutiny, intermediate scrutiny, or rational

basis review.

Moreover, perhaps the most important aspect of *Stevens* and *Brown* for this

case is what the Court *did not* say. Indeed, with *Stevens* and *Brown*, the Supreme

Court did not (at least for now) purport to create a unified theory of the First

Amendment that would preempt all prior approaches and substitute a new

doctrine. While perhaps the Court did just this (and if it did, it can tell us in

*Alvarez*), we are quite confident the Court, if it sought such a bold result, would

have expressly overruled prior doctrines. Instead, what the Court did was put in

place a framework for assessing "*novel* restrictions" and "*new* categories of

unprotected speech," *Brown*, 131 S. Ct. at 2734 (emphasis added). But in neither

*Stevens* nor *Brown* did the Court indicate an intention to disturb or reverse

longstanding free speech jurisprudence for unprotected categories it has already

addressed in other ways.[10]

---

[10] In addition, although the Supreme Court has identified some examples of historically unprotected categories of speech, it has offered very little guidance regarding the level of generality with which we should define these categories. So in coming up with a list of unprotected categories of speech, a court may be faced with intractable questions. Are the categories of defamation, fraud, perjury, and false light discrete and limited? Or are they merely examples of the sorts of speech encompassed in the overarching category of knowingly false statements of

(continued...)

-29-

As we read the cases, one such unprotected category is knowingly false statements of fact—a category the Supreme Court has considered time and again for the past 50 years. Under this understanding, the standard of review is straightforward: so long as the legislature leaves breathing space for valuable speech, it may restrict knowingly false statements of fact.

Accordingly, our inquiry *is not* whether the Stolen Valor Act is narrowly tailored to serve a compelling governmental interest. This is the lesson of *New York Times*, *Garrison*, *Gertz*, and the numerous cases that followed—none of which has been overturned or questioned. The Court's false-statements precedents remain good law, and the Court in *Stevens* and *Brown* did not purport to reverse *New York Times*, *Garrison, Gertz*, and their heirs *sub silentio*. As the dissenting opinion in *Alvarez* stated, "We do not have the authority as a lower

---

[10](...continued)
fact? The problem here is that the only criterion identified by the Supreme Court—history—is of no help in determining the level of generality at which the unprotected categories should be described.

The best guidance we find on this question comes from an entirely different context. In *Michael H. v. Gerald D.*, 492 U.S. 110, 127 n.6 (1989), the Supreme Court suggested that, in determining the level of generality at which traditional protections of family autonomy should be described, "We refer to the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified." *See* Tushnet, *supra*, at 15–17 (discussing the difficulties in identifying the level of generality with which to describe unprotected categories of speech).

court to limit the Court's statements to what we believe they mean rather than what they actually say." 617 F.3d at 1223 (Bybee, J., dissenting).

The dissent conceptualizes the case law as applying only to "injurious falsehoods." Dissent, *passim*. This analysis has much to commend itself. But the Supreme Court has yet to announce such a category, and as we read the cases to date its cases express a different principle. Even the dissent recognizes that the "injury" element does not flow naturally from the case law, requiring it to extract a broad notion of "direct" and "indirect" injury to persons and governmental processes to protect traditional areas regulated by statute or tort law. Dissent at 41-42. Even so, this categorization calls into question many laws we describe above which require little or no injury to a third person or the government. Perhaps the Supreme Court will adopt an analysis requiring public injury and falsehood—but as we read the cases, it has yet to do so.

In sum, we understand current Supreme Court precedent to hold that although the First Amendment protects ideas, beliefs, and some erroneous statements of fact, the same level of protection does not generally extend to knowingly false statements of fact. Therefore, a restriction on knowingly false factual statements is constitutional so long as it has some limiting characteristic that prevents it from suppressing constitutionally valuable opinions and true statements.

### 4. Other Regulations of False Speech

The constitutional doctrine thus admits to some regulation of false speech, and many examples, from both the federal government and the states, confirm this understanding. Contrary to Strandlof's contentions, the Stolen Valor Act does not stand alone. Congress has not been reluctant to enact, and the Supreme Court has not hesitated to uphold, a number of broadly applicable measures regulating, and occasionally criminalizing, false statements of fact.

Perhaps the most familiar of these statutes is 18 U.S.C. § 1001(a), which prohibits "knowingly and willfully" making any "materially false, fictitious, or fraudulent statement or representation" in "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."[11] Although § 1001 initially prohibited only false statements that were intended to defraud, in 1934 Congress amended the provision to remove the deceptive-intent requirement. *See United States v. Yermian*, 468 U.S. 63, 70–71 (1984). Not only can one be prosecuted without intentionally lying, convictions under the statute also do not require any showing of actual pecuniary or property loss to the government. *United States v. Gilliland*, 312 U.S. 86, 93 (1941) (the government need only show that "perversion [] *might* result from [] deceptive

---

[11] For a discussion of § 1001 and other statutory examples, see Brief for the United States, *United States v. Alvarez*, No. 11-210, at 29–33 (U.S. Dec. 1, 2011).

practices . . . ." (emphasis added)). The Supreme Court has considered § 1001 in numerous cases but has never suggested it runs afoul of the First Amendment, at least facially. *See, e.g.*, *United States v. Rodgers*, 466 U.S. 475, 480 (1984); *Brogan v. United States*, 522 U.S. 398, 400–06 (1998).

Section 1001 is not a lone example. To the contrary, there are at least 100 other federal criminal statutes that penalize making false statements—none of which has been invalidated under the First Amendment. *See United States v. Wells*, 519 U.S. 482, 505 (1997) (Stevens, J., dissenting) ("[A]t least 100 federal false statement statutes may be found in the United States Code. About 42 of them contain an express materiality requirement; approximately 54 do not."). For example, it is a crime to falsely and willfully claim to be a citizen of the United States, 18 U.S.C. § 911, and it is a crime to make a knowingly false statement for the purpose of establishing eligibility to vote, 42 U.S.C. § 1973i(c). Likewise, various perjury statutes criminalize false statements made under oath, even if the perjurer has no intent to mislead, and even if there is no harm to the tribunal or inquiry. *See* 18 U.S.C. § 1623; 18 U.S.C. § 1621; *Brogan*, 522 U.S. at 402 & n.1. As with § 1001, the Court has never suggested these provisions are unconstitutional.

Similar criminal statutes abound. *See, e.g.*, 18 U.S.C. §§ 922(a)(6), 924(a)(1)(A) (knowingly false statements in connection with purchasing and owning firearms); 22 U.S.C. § 2778(c) (willfully untrue statements on report

involving export and import of arms); 18 U.S.C. § 1015 (knowingly false statements related to citizenship and naturalization); 18 U.S.C. § 1027 (knowingly false statements in records required by ERISA); 20 U.S.C. § 1097(b) (knowingly false statements in connection with assignment of federally insured student loan); 42 U.S.C. § 405(c)(2)(C)(I) (willful and deceitful use of a false social security number); *see also Wells*, 519 U.S. at 505 n.9 (cataloguing statutes); *United States v. Gaudin*, 28 F.3d 943, 959 n.3 (9th Cir. 1994) (Kozinski, J., dissenting) (cataloguing statutes).

Additionally, in a related area of law relevant to Strandlof's challenge, Congress has made it a crime to falsely purport to speak on behalf of the government. For example, it is illegal to falsely claim to be a federal officer, 18 U.S. § 912, or to convey a false impression of governmental endorsement in association with the Social Security Administration, 42 U.S.C. § 1320b-10(a). The goal of these provisions is to prevent con artists from misappropriating and diluting the government's message. *See United States v. Lepowitch*, 318 U.S. 702, 704 (1943) ("actual financial or property loss" are not elements of § 912 because Congress enacted the statute to "maintain the general good repute and dignity" of government service). The Stolen Valor Act accomplishes a similar goal.

States have passed analogous measures. For example, multiple state courts have upheld laws barring individuals from falsely claiming to have a particular

university degree or professional license. *Long v. State*, 622 So. 2d 536 (Fla. Dist. Ct. App. 1993) (upholding statute barring knowingly false claims of having a university degree); *People v. Kirk*, 310 N.Y.S.2d 155 (Cnty Ct. 1969) (same); *State v. Marino*, 929 P.2d 173 (Kan. Ct. App. 1996) (upholding statute barring knowingly false claims of having a professional license). Other states have upheld laws banning candidates for office from making knowingly false statements in the context of political campaigns. *See, e.g.*, *Treasurer of the Comm. to Elect Gerald D. Lostracco v. Fox*, 389 N.W.2d 446 (Mich. Ct. App. 1986) (upholding a statute banning false claims that one is an incumbent); *State v. Davis*, 499 N.E.2d 1255 (Ohio Ct. App. 1985) (affirming criminal conviction for knowingly making false statements of fact in a political campaign); *Ohio Democratic Party v. Ohio Elections Comm'n*, No. 07AP-876, 2008 WL 3878364 (Ohio Ct. App. Aug. 21, 2008) (upholding a statute prohibiting candidates from claiming to hold an office they do not currently hold). Examples of false-statement laws enacted by state legislatures are too numerous to list, but it suffices to say these laws cover widely divergent categories of false factual speech.[12] *See, e.g.*, Alaska Stat. § 11.56.800(a)(2) (punishing "false report[s] to a peace officer that a crime has occurred or is about to occur"); Ariz. Rev. Stat. §

---

[12] In addition to those listed here, *amici* in *Alvarez* have provided an extensive list of representative false-statements provisions enacted by state legislatures. *See* Brief for 20 States as *Amici Curiae* Supporting Petitioner at 2–4 & n.1, *United States v. Alvarez*, No. 11-210, at 26–27 (U.S. Dec. 8, 2011)

13–2907.03 (punishing a knowingly "false report of sexual assault involving a spouse"); Conn. Gen. Stat. § 53-378(b) (prohibiting lies about receiving military awards); Kan. Stat. Ann. § 21-6410 (punishing falsely claiming to be a member of a veterans' organization); Nev. Rev. Stat. § 199.145 (punishing any willful "unqualified statement of that which the person does not know to be true" made under oath); Rev. Code Wash. § 9A.60.070 (punishing knowingly false claims of "a credential issued by an institution of higher education that is accredited," in promotion of a business or with the intent to obtain employment); *see also Alvarez*, 636 F.3d at 684 (O'Scannlain, J., dissenting from denial of rehearing en banc) (cataloguing federal and state false-statements laws); Larry D. Eldridge, *Before Zenger: Truth and Seditious Speech in Colonial America, 1607–1700*, 19 Am. J. Legal Hist. 337, 352–53 (1995) (citing examples of Colonial-era statutes regulating false speech).

Finally, we note there are numerous examples of state-law convictions for various forms of impersonation and misappropriation of governmental speech. *See, e.g.*, *State v. Messer*, 91 P.3d 1191 (Kan. 2004) (upholding conviction under Kansas false impersonation statute when defendant falsely claimed to be an undercover police officer, apparently with no attempt to use the pretense to obtain money or property); *State v. Wickstrom*, 348 N.W.2d 183 (Wis. Ct. App. 1984) (upholding a state ban on falsely acting as a police officer); *State v. Cantor*, 534

A.2d 83 (N.J. Super. Ct. App. Div. 1987) (upholding conviction of defendant who impersonated a county morgue employee).

*   *   *

With this legal framework and historical background, we turn to the constitutionality of the Stolen Valor Act.

### B. Constitutionality of the Stolen Valor Act

Under the Supreme Court's precedents, the Stolen Valor Act is facially constitutional. The Act prohibits only knowingly false statements of fact, it provides breathing space for valuable speech, and it "reach[es] no farther than is necessary to protect the legitimate interest involved." *Gertz*, 418 U.S. at 349. There is almost no danger anyone would suppress their speech to avoid punishment under the Act.

Most importantly, under the Act, no one may be punished unless it is proven that he *knowingly* made a false statement of fact, and the government must establish any disputed facts beyond a reasonable doubt. This scienter requirement provides "an extremely powerful antidote to the inducement to [] self-censorship." *Id.* at 342. And tellingly, the Supreme Court has *never* invalidated a false-statement restriction that contains a knowledge requirement.

Further, not just any false statement is punishable under the Stolen Valor Act. Utterances criminalized by the Act are objective and verifiable, and they are particularly valueless under First Amendment principles. Although military

affairs are undoubtedly matters of public importance, lying about receiving military medals does nothing to contribute to any conceivable public debate. The Stolen Valor Act simply does not punish political speech, factually correct statements, artistic expressions, or opinions of any sort.[13] No one is inhibited from criticizing the armed forces, opining about military actions and administration, stating political opinions, or reporting on governmental affairs. And nothing about the Stolen Valor Act impinges upon our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *New York Times*, 376 U.S. at 270. By prohibiting only specific, knowingly false assertions of fact that do not bear on political speech or matters of public debate, the Act promotes the "large[] public interest, secured by the Constitution, in the dissemination of truth." *Garrison*, 379 U.S. at 73.

In this same vein, the Stolen Valor Act's content-based restriction is permissible because "there is no realistic possibility that official suppression of ideas is afoot." *R.A.V.*, 505 U.S. at 390, *see also id.* at 387, 391 ("[C]ontent discrimination," even within a class of "proscribable speech," is presumptively unconstitutional because it may "impose special prohibitions on those speakers who express views on disfavored subjects."). False claims violating the Act do

---

[13] Further, if an exceptional false statement about one's military honors did constitute a form of protected speech (e.g., political speech), the Stolen Valor Act could be challenged on an as-applied basis even though we find the Act facially constitutional.

not advance a particular viewpoint or a specific topic of debate.  A person is extraordinarily unlikely to mistakenly claim to have been awarded a military medal, and the accuracy of statements regarding military awards is objectively verifiable.  *Cf. Virginia State Bd. of Pharmacy*, 425 U.S. at 771 n.24 (false statements in commercial advertising are more easily punishable than other false statements because "[t]he truth of commercial speech . . . may be more easily verifiable by its disseminator than, let us say, news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else").  Indeed, there is scant risk the Stolen Valor Act would cause someone to refrain from truthful speech about military awards out of "doubt whether [truth or lack of knowledge] can be proved in court or fear of the expense of having to do so." *New York Times*, 376 U.S. at 279.

This contrasts the false speech at issue here with libel or defamation actions, where it is often challenging to determine whether factual allegations are in fact untruthful.  "Even courts accepting th[e] defense [of truthfulness] as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars." *Id.*  Determining whether someone has violated the Stolen Valor Act is simple and, in nearly any conceivable case, not subject to error.  Therefore, the government cannot use the Stolen Valor Act to suppress undesirable political opinions.

For these reasons, the Stolen Valor Act simply does not encroach on any protected speech. It punishes only false statements that are made knowingly and are objectively verifiable; there is no risk of stifling opinions or true statements; the Act does not advocate any particular viewpoint or take a stance on any dogma or scientific issue; there is no danger that a political majority could use the law to censor legitimate speech; and there is no threat of suppressing ideas or opinions. In short, breathing space is plentiful. There is no danger that anyone would suppress their speech to avoid prosecution under the Stolen Valor Act.

Finally, even were we to assume the Stolen Valor Act chills some speech, it "reach[es] no farther than is necessary to protect the legitimate interest involved." *Gertz*, 418 U.S. at 349. As an initial matter, the government has an important— perhaps compelling—interest in preventing individuals from falsely claiming to have received military awards.[14] As we described, the government's tradition of awarding military honors in recognition of valorous acts in service dates back to the Revolutionary War. Ever since, the United States has maintained a strictly regulated system of military awards to commend heroism, foster pride in service, and motivate service members to higher achievement. *See, e.g.*, *Examination of*

---

[14] We need not decide, however, whether the Stolen Valor Act is narrowly tailored to serve a compelling governmental interest. Some courts and judges have reached this conclusion, and a majority hold that the Act is insufficiently narrow to survive strict scrutiny. *See, e.g.*, *Alvarez*, 617 F.3d at 1217 ("[H]onoring and motivating our troops are doubtless important governmental interests, but we fail to see how the Act is necessary to achieving either aim.").

*Criteria for Awards and Decorations: Hearing before the Subcomm. on Military Personnel of the H. Comm. on Armed Services*, 109th Cong., 2d Sess. 24 (2006) (statement of Lt. Gen. Roger A. Brady) (stating that, by "recognizing acts of valor, heroism, and exceptional duty and achievement," military medals serve the important purpose of "foster[ing] morale, mission accomplishment and *esprit de corps*" among service members); *id.* at 26 (statement of Brig. Gen. Richard P. Mills) (highlighting the "importance of a viable and robust military combat awards system in maintaining morale, *esprit de corps*, and pride in [one's] fellow Marines"). Military medals confer prestige on recipients and express the country's gratitude for heroic acts and service. Given this, it follows Congress could conclude that falsely proclaiming to be a decorated veteran diminishes the value of military awards, misappropriates the government's speech, and interferes with the military's ability to make statements regarding the valor of its soldiers. *Cf. San Francisco Arts & Athletics Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 532 n.8 (1987) (recognizing the government's interest in preventing misappropriation of the term "Olympics," and analogizing that prohibition to 18 U.S.C. § 705, which prohibits the unauthorized use of the insignia of veterans' organizations).

Further, the Stolen Valor Act is closely tied to the strong governmental interest in protecting the value of military honors. As already explained, the Act chills very little, if any, protected speech. Moreover, the Act is but the latest,

-41-

incremental step among many Congress has taken to protect the integrity and effectiveness of the military honors system. In addition to a longstanding and well-developed set of guidelines governing military awards, *see generally* Dept. of Defense, *Manual of Military Decorations and Awards* (2010), the government has installed numerous specific measures to safeguard the prestige of military honors. Among many others, these include: prohibiting the award of the highest honors to those whose subsequent conduct has not been honorable; revoking medals if later-discovered facts would have foreclosed the award of the medal; publishing the names of Medal of Honor recipients; taking steps to protect the intellectual property associated with medal designs, so as to prevent imitations; establishing a committee to review previous Medal of Honor recipients and rescind those who did not meet standards codified into law; and, with § 704(a), prohibiting wearing, manufacturing, or selling a military medal without authorization. Congress passed the Stolen Valor Act after determining that preexisting steps were insufficient to prevent false claims. Given how little risk there is that the Act would chill protected speech, we cannot say the measure is too expansive.

The Stolen Valor act survives breathing space review and is constitutional.

### III. Conclusion

For the foregoing reasons, we REVERSE the district court's dismissal and REMAND for proceedings consistent with this opinion.

10-1358, *United States v. Strandlof*

**HOLMES**, Circuit Judge, dissenting.

The Stolen Valor Act makes it a crime for a person to "falsely represent[]
himself or herself, verbally or in writing, to have been awarded" any
congressionally authorized military decoration or medal. 18 U.S.C. § 704(b).
Offenders face up to six months in prison, a penalty that doubles to one year if
the false representation concerns certain medals, including the Congressional
Medal of Honor, the Silver Star, and the Purple Heart. *See id.* §§ 704(c), (d). On
its face, the Act criminalizes the bare utterance of a false statement of fact. The
majority holds that such statements—at least when made knowingly and with an
intent to deceive—are categorically beyond the protective universe of the First
Amendment. In contrast, I believe that the First Amendment *generally* accords
protection to such false statements of fact. Consequently, because it is a content-
based restriction on speech, the Stolen Valor Act must satisfy strict scrutiny.
This it cannot do. I would hold that the district court was correct in striking down
the Act as unconstitutional. Therefore, on this basis, I must respectfully dissent.

In Part I, I summarize the relevant factual and procedural background. In
Part II, I express my concerns regarding the majority's constitutional-avoidance
analysis and discuss the Supreme Court's First Amendment jurisprudence, with a
specific focus on the Court's recognition of certain categories of unprotected
speech. I conclude that the Court has not held that false statements of fact (even

those knowingly made with an intent to deceive) comprise a unitary category of unprotected speech, but rather has excepted from the First Amendment's protections only a discrete subset of false factual statements—that is, falsehoods that either cause, or pose a significant risk of causing, injury. The false statements proscribed by the Stolen Valor Act encompass much more and do not require injury or the risk of it.

In Part III, I review the common-law and statutory treatment of false statements of fact throughout our nation's history, including around the time that the First Amendment was adopted, and conclude that it supports my view that false statements of fact—absent injury or a significant risk of it—were not subject to legal sanction. In Part IV, I detail some of my specific concerns regarding the majority's analysis and in particular conclude that (1) the majority's so-called "breathing space" inquiry turns customary First Amendment analysis on its head, by obliging the *speaker* in the context of a content-based speech restriction, as here, to justify after the fact why his or her speech should not be regulated; and (2) despite the majority's contrary assertions, its breathing space analysis, in operation, is the kind of balancing test that the Supreme Court has condemned and is at odds with First Amendment values. In Part V, I detail why the Stolen Valor Act cannot be construed to target injurious falsehoods and, therefore, it cannot be held, at its core, to proscribe speech that falls within the ambit of a categorical exception to the First Amendment's protections. Finally, in Part VI,

having concluded that the speech targeted by the Stolen Valor Act is protected by the First Amendment, I apply strict scrutiny to the Act because it is a content-based restriction.  I assume without deciding that the government's interests are compelling, but conclude that the Act is neither narrowly tailored to the asserted interests nor necessary to achieve them.  Accordingly, the Act cannot withstand strict scrutiny, and I conclude that it is therefore unconstitutional.  I would hold that the district court's judgment should be affirmed.

## I.

Defendant-Appellee Rick Glen Strandlof is the founder of a veterans organization called the Colorado Veterans Alliance.  In connection with his activities for the group, Mr. Strandlof used the alias "Captain Rick Duncan," and often spoke of his "military career."  He claimed to have graduated from the Naval Academy, risen to the rank of captain in the United States Marine Corps, served three tours of duty in Iraq, and been injured by an improvised explosive device in Fallujah.  For his purported sacrifice and service, Mr. Strandlof also claimed to have been awarded both the Purple Heart and the Silver Star.

Colleagues at the veterans group eventually became suspicious of Mr. Strandlof's claims.  Following some basic inquiries, they were able to uncover that Mr. Strandlof had neither served in the military nor received the aforementioned medals.  They subsequently reported his misrepresentations to the Federal Bureau of Investigation ("FBI"), which conferred with military officials

-3-

to confirm that these claims were, in fact, fabrications. In an interview with FBI agents on May 13, 2009, Mr. Strandlof admitted to never serving in the military and to misrepresenting himself as a wounded veteran during his management of the Colorado Veterans Alliance. Subsequently, he was charged in a five-count information for violating the Stolen Valor Act, 18 U.S.C. § 704(b).[1] The Act provides in full:

> Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.

*Id.* The Act doubles the penalties where the claims pertain to certain specified medals, including the Purple Heart and the Silver Star. *See id.* § 704(d).

On December 2, 2009, Mr. Strandlof moved to dismiss the information, arguing that the Act is unconstitutional under the First Amendment. After entertaining a full round of briefing, the district court granted the motion to dismiss, finding the statute to be facially unconstitutional. *United States v. Strandlof*, 746 F. Supp. 2d 1183, 1185 (D. Colo. 2010). In so doing, the court rejected the government's contention that "admittedly false statements enjoy no

---

[1]     On December 14, 2009, the government filed an amended information charging Mr. Strandlof with a "knowing" violation in each of the five counts.

4

First Amendment [protection] at all," finding it contrary to "well-established First Amendment doctrine." *Id.* at 1186. Relying on the Supreme Court's recent decision in *United States v. Stevens*, 130 S. Ct. 1577 (2010), the district court reasoned that the broad category of "admittedly false statements" was not within the "limited universe of 'well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.'" *Id.* at 1186–87 (quoting *Stevens*, 130 S. Ct. at 1584). It also warned that the government's position that the First Amendment protected false statements of fact only when necessary to protect "speech that matters" was troubling because it "invite[d] [the government] to determine what topics of speech matter enough for the citizenry to hear," *id.* at 1186 (internal quotation marks omitted), and it resembled the "ad hoc calculus of costs and benefits" that the Supreme Court had specifically rejected in *Stevens* as a "free-floating test for First Amendment coverage" that was "startling and dangerous," *id.* at 1187 (quoting *Stevens*, 130 S. Ct. at 1585–86) (internal quotation marks omitted).

Finding that false statements of fact were not generally excluded from the First Amendment's protection and that the Act was a content-based regulation of speech, the district court then applied strict scrutiny and invalidated the Act. *Id.* at 1188–89. The court reasoned that, although the government asserted that the Act is "intended to preserve the symbolic significance of military medals," this was hardly a "sufficiently compelling [interest] to withstand First Amendment

5

scrutiny," especially in light of the Supreme Court's jurisprudence regarding flag burning. *Id.* at 1189 (citing *Texas v. Johnson*, 491 U.S. 397 (1989)). Moreover, the district court found that the government's claim that "[d]iluting the meaning or significance of [the] medals . . . could impact the motivation of soldiers to engage in valorous, and extremely dangerous, behavior on the battlefield" was "wholly unsubstantiated," "shocking, and indeed, unintentionally insulting to the profound sacrifices of military personnel the [Act] purports to honor." *Id.* at 1190 (first alteration in original) (quoting Gov't Resp. to Amicus Br. of Rutherford Inst. at 12 (Dist. Ct. Dkt. # 31-3)) (internal quotation marks omitted). It concluded, therefore, that because the government lacked a compelling interest sufficient to justify a content-based restriction on speech, the Act was unconstitutional.[2] *See id.* at 1192. This appeal followed.

## II.

There is little dispute that the Stolen Valor Act operates as a content-based restriction on speech. The Act punishes "false[] represent[ations]" of having received a military medal. 18 U.S.C. § 704(b). It therefore restricts speech based on its content and subject matter, *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 536 (1980), and based on disapproval of "the

---

[2]      Because it found that the Stolen Valor Act was unconstitutional on this ground, the district court declined to consider Mr. Strandlof's further argument that the statute was not narrowly tailored. *See Strandlof*, 746 F. Supp. 2d at 1189.

6

message it conveys," *Hill v. Colorado*, 530 U.S. 703, 719 (2000) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (internal quotation marks omitted).  This makes the Act "presumptively invalid, and the Government bears the burden to rebut that presumption."  *Stevens,* 130 S. Ct. at 1584 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000)) (internal quotation marks omitted).  Generally, this would require the government to show that the Act is necessary to achieve a compelling governmental interest and is narrowly tailored to that end.  *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011).

However, certain "historic and traditional categories" of speech are amenable to content-based restrictions without the government having to satisfy this exacting standard.  *Stevens*, 130 S. Ct. at 1584 (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 127 (1991) (Kennedy, J., concurring in the judgment)) (internal quotation marks omitted).  These categories, "long familiar to the bar," *id.* (quoting *Simon & Schuster*, 502 U.S. at 127 (Kennedy, J., concurring in the judgment)) (internal quotation marks omitted), are "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," *id.* (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)) (internal quotation marks omitted).  The fundamental dispute in this

case—between the parties and between the majority and me—centers on whether false statements of fact constitute such a category.

### A.

Before addressing that question head-on, I feel obliged to confront the majority's attempt to narrow the scope of the Stolen Valor Act under the banner of constitutional avoidance. "The Supreme Court," says the majority, "requires we read an act of Congress narrowly, so as to avoid constitutional problems." Maj. Op. at 10. While we are indeed under a duty to construe "ambiguous statutory language" so as "to avoid serious constitutional doubts," *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009), we exercise that duty only when a statute is "readily susceptible" to a limiting construction, *Stevens*, 130 S. Ct. at 1592 (quoting *Reno v. ACLU*, 521 U.S. 844, 884 (1997)) (internal quotation marks omitted). We should not "rewrite a . . . law to conform it to constitutional requirements." *Reno*, 521 U.S. at 884–85 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988)) (internal quotation marks omitted).

The majority finds that the Stolen Valor Act is "limited in two important ways." Maj. Op. at 10. First, it says that the statute "contains a scienter element, which operates to criminalize only knowingly false statements about receiving military awards." *Id.* at 10–11. Despite the fact that the Act does not, on its face, require that a false statement be uttered knowingly, I am comfortable with this aspect of the majority's limiting construction. *See Staples v. United States*, 511

8

U.S. 600, 605 (1994) (imposing a knowledge requirement on a criminal statute otherwise silent as to *mens rea*).

However, in the context of imposing this first limitation, the majority actually goes further. It effectively imposes an additional constraint on the scope of the statute by reading into § 704(b)'s reference to "false[] represent[ation]" a requirement that the speaker have a "specific *intent to deceive*." Maj. Op. at 10. Whence this limitation? Certainly not the statutory text, which says not a word about intent (much less deception). Nor can it be said that knowledge and intent to deceive are conterminous *mens-rea* concepts. The Model Penal Code treats intent (what it calls "purpose") and knowledge as separate states of mind, *see* Model Penal Code § 2.02, as do many modern criminal codes, *see* Wayne R. LaFave, *Substantive Criminal Law* § 5.2 n.12 (2d ed. 2003). Congress, too, recognizes the distinction. A number of federal false-statement statutes set forth knowledge of falsity and intent to deceive as separate prerequisites to liability. *See, e.g.*, 10 U.S.C. § 907; 15 U.S.C. § 78jjj(d)(1); 18 U.S.C. § 842; 18 U.S.C. § 922(a)(6); 18 U.S.C. § 1033(a)(1); 42 U.S.C. § 408(a)(6).[3]

Because Congress knows how to impose an intent requirement when it wants to, the majority's grafting of an intent-to-deceive element onto the Stolen

---

[3]    Several other statutes, punishing fraudulent acts as opposed to pure speech, also require both knowledge of falsity and intent to deceive. *See, e.g.*, 10 U.S.C. § 923a; 18 U.S.C. § 716; 18 U.S.C. § 2252B(a)–(b); 18 U.S.C. § 2252C(a)–(b); 42 U.S.C. § 408(a)(7)(A).

Valor Act must be viewed as an exercise in revision, not interpretation. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2717–18 (2010) (declining to construe a criminal statute, which already contained a knowledge requirement, to contain an additional intent element, even if doing so would have avoided a First Amendment problem). Thus, even though I am comfortable with the majority's claimed first limitation on the Act—imposing a knowledge requirement—I take exception to its attempt at the same time to map onto the statute a distinct *mens-rea* element of intent to deceive.

All this might go unmentioned, except that the majority's novel addition to the statute does some heavy lifting, supporting what the majority calls its second (in reality, the third) limitation on the Act relating to "any satirical, rhetorical, theatrical, literary, ironic, or hyperbolic statements," which the majority says "qualify as protected speech." Maj. Op. at 11. Specifically, the majority posits: "The Act's requirement that false statements be made with an intent to deceive . . . would not allow the government to prosecute individuals for making ironic or other artistically or politically motivated statements." *Id.* Even assuming, *arguendo*, that the Act contains a "requirement" that the speaker have an intent to deceive, this conclusion does not logically follow.

Intentionally deceptive falsehoods and "ironic, dramatic, diplomatic, and otherwise polite speech," *id.*, are not the mutually exclusive categories that the majority conceives them to be. After all, the little white lie and the children's

10

fairy tale (think Santa Claus) are *designed* to deceive. Artistic expression, too, may employ intentional deception. Consider an uplifting example: Parson Weems's tall tale about young George Washington's refusal to tell a tall tale. *See* M. L. Weems, *The Life of George Washington* 13–14 (Phila., Joseph Allen 1833). The biographical anecdote, in which the young Washington allegedly confessed to taking a hatchet to the family's cherry tree because he "c[ould]n't tell a lie," *see id.* at 14, is by all accounts a falsehood, despite Weems's insistence that it was "too true to be doubted," *id.* at 13.[4] But while the good parson may have traded on a fib to promote the virtue of honesty—that is, knowingly made a false factual statement with intent to deceive—we do not value the virtue, nor the fib, any less. In fact, the tale is a fixture of our national mythology.

The point here is simple: Some intentional deceptions may indeed be tools for expressing the "ironic," the "artistic[]," the "politically motivated," the "dramatic," and the "polite." *See* Maj. Op. at 11. In other words, intentionally deceptive speech and such matters are not mutually exclusive. I am not convinced, then, that engrafting onto the Stolen Valor Act an intent-to-deceive requirement allays constitutional doubt and assures any firmer footing on the "slippery slope" that the majority recognizes—a slope down which "Congress

---

[4] Weems's biography first appeared in 1800. He added the cherry-tree anecdote in the fifth edition, published in 1806. Lyrissa Barnett Lidsky, *Authorship, Audiences, and Anonymous Speech*, 82 Notre Dame L. Rev. 1537, 1561 n.127 (2007).

could criminalize an appallingly wide swath," *id.*, of speech that is ordinarily thought to lie at the heart of the First Amendment. *See id.*[5]

Notwithstanding my concerns regarding the majority's constitutional-avoidance analysis, I have evaluated the First Amendment validity of the Stolen Valor Act with the majority's limiting interpretation in mind. Alas, even assuming that the majority's interpretation is permissible, in my view, the Act does not pass constitutional muster. In sum, I believe that the speech targeted by the Act does not fall within a historically unprotected category and the Act does not survive strict scrutiny.

**B.**

While the Supreme Court and individual Justices have often undertaken to enumerate the categories of unprotected speech, constructing a canon would be a difficult task. The lists that appear in the Court's opinions are incomplete and do not employ a common vocabulary.[6] On several occasions, particular *types* of

---

[5] The majority's limiting construction is further problematic because it places upon the speaker the burden of showing that his speech—knowingly false and intentionally deceptive as it is—is in fact satirical, literary, artistic or hyperbolic. As with the "breathing space" review that the majority employs (which I shall address later), this flips customary First Amendment analysis on its head.

[6] *See Brown*, 131 S. Ct. at 2733 (obscenity, incitement, and fighting words); *Stevens*, 130 S. Ct. at 1584 (obscenity, defamation, fraud, incitement, and speech integral to criminal conduct); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992) (obscenity, defamation, and fighting words); *Simon & Schuster*, 502 U.S. at 127 (Kennedy, J., concurring in the judgment) (obscenity, defamation,

(continued...)

12

false statements have been listed. *See Stevens*, 130 S. Ct. at 1584 ("defamation" and "fraud"); *R.A.V.*, 505 U.S. at 383 ("defamation"); *Bose Corp.*, 466 U.S. at 504 ("libelous speech"); *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 592–93 (Rehnquist, J., dissenting) ("group libel" and "false and misleading commercial speech"). However, the Court has never listed the "false statement of fact" as an unprotected category unto itself.

My colleagues in the majority nevertheless believe that false statements of fact—at least when knowingly made, with an intent to deceive—are part of the canon of unprotected speech because the Supreme Court has repeatedly recognized that "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). To be sure, a string of Supreme Court cases contain dicta to this effect.[7] For two related reasons,

---

[6](...continued)
incitement, and "situations presenting some grave and imminent danger [that] the government has the power to prevent"); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 n.5 (1985) (plurality opinion) (obscenity, fighting words, advocating the violent overthrow of the government, publication of troopship sailings during wartime); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504 (1984) (libelous speech, fighting words, incitement to riot, obscenity, and child pornography); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 592–93 (1980) (Rehnquist, J., dissenting) (fighting words, group libel, obscenity, defamation, and false and misleading commercial speech); *Chaplinsky*, 315 U.S. at 572 (referencing "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words").

[7] *See Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he intentional lie is no essential part of any exposition of ideas." (quoting *Gertz*, 418 U.S. at 340) (internal quotation marks omitted)); *BE*
(continued...)

however, I do not think these cases stand for the proposition that, without more, bare falsehood—even if knowingly uttered, with an intent to deceive—is categorically beyond the First Amendment's heightened protections.

First, the Court's pronouncements concerning false statements have come in the context of more narrow *types* of false statements, such as defamation and other speech torts, *see, e.g.*, *Falwell*, 485 U.S. at 52; fraud, *see Telemarketing Assocs.*, 538 U.S. at 612; and false commercial speech, *see Va. State Bd. of Pharmacy*, 425 U.S. at 771.  Second, and relatedly, despite the Court's repeated dicta concerning false statements, it has *never* read its own precedent as

---

[7](...continued)
*& K Constr. Co. v. NLRB*, 536 U.S. 516, 531 (2002) ("[F]alse statements . . . [are] unprotected for their own sake . . . ."); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) ("False statements of fact are particularly valueless . . . ."); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) ("There is 'no constitutional value in false statements of fact.'" (quoting *Gertz*, 418 U.S. at 340)); *Herbert v. Lando*, 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials."); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976) ("[I]naccurate and defamatory reports of facts[ are] matters deserving no First Amendment protection . . . ."); *Gertz*, 418 U.S. at 340 ("[T]here is no constitutional value in false statements of fact."); *Time, Inc. v. Pape*, 401 U.S. 279, 292 (1971) ("Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation." (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)) (internal quotation marks omitted)); *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection."); *see also Brown v. Hartlage*, 456 U.S. 45, 60 (1982) ("[D]emonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements.")

establishing a unitary, all-encompassing category of false statements that are excepted from the First Amendment's protections. Rather, the Court has focused on false statements as they arise in discrete legal contexts. For example, *Stevens*, one of the most recent cases providing a list of unprotected speech, enumerates "defamation" and "fraud" separately and cites different cases for each. *See* 130 S. Ct. at 1584. Other lists often include defamation or libel specifically, but no other type of false statement. *See supra* note 6. If it is the false factual statement *generally* that is unprotected, then it is surely puzzling not only that the Court has never said so over the past four decades, but also that it has repeatedly taken pains to enumerate particular types of false factual statements rather than advert to a unitary unprotected category—false factual statements. *See Nike, Inc. v. Kasky*, 539 U.S. 654, 664 (2003) (Stevens, J., concurring in dismissal of writ of certiorari as improvidently granted) (noting that the Court's dicta concerning false statements are "perhaps overbroad[]").

## C.

If there is a common feature that binds together the types of false statements enumerated in the Supreme Court's past lists, it is something more than mere falsehood. As the Court has reminded us often, *bare falsity* is not enough to strip a statement of constitutional protection. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 152 (1967) (plurality opinion) ("While the truth of the underlying facts might be said to mark the line between publications which are of

15

significant social value and those which might be suppressed without serious social harm . . . , we have rejected . . . the argument that a finding of falsity alone should strip protections from the publisher."); *Time, Inc. v. Hill*, 385 U.S. 374, 387 (1967) ("Factual error . . . [is] insufficient for an award of damages for false statements . . . ."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964) ("[F]actual error . . . [does not] suffice[] to remove the constitutional shield . . . ."); *see also Sullivan*, 376 U.S. at 271 ("[C]onstitutional protection does not turn upon the truth . . . ." (quoting *NAACP v. Button*, 371 U.S. 415, 445 (1963)) (internal quotation marks omitted)). Justice Roberts put it most eloquently in *Cantwell v. Connecticut*:

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification . . . , and *even to false statement*. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

310 U.S. 296, 310 (1940) (Roberts, J.) (emphasis added).

If falsity alone is insufficient to "remove the constitutional shield," *Sullivan*, 376 U.S. at 273, something more is required. While the Court has never explicitly said what that "something" is, one variable stands out as having significant explanatory power: the presence of, or a significant risk of, *injury*, be it to an individual or to the processes of government. Without exception, the

16

false statements at issue in the Court's cases have been those that involve an actual distinct harm or a significant risk of it, the prevention of which is a constitutionally cognizable governmental interest. *See Telemarketing Assocs.*, 538 U.S. at 612 (stating that "the First Amendment does not shield fraud" because "the government's power to protect people against fraud has always been recognized in this country and is firmly established" (quoting *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948)) (internal quotation marks omitted)); *Gertz*, 418 U.S. at 341 ("The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood.").[8]  Justice Holmes illustrated this principle well:

> The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. . . . The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.

---

[8]     *See also Falwell*, 485 U.S. at 52 ("False statements of fact are particularly valueless . . . [because] they cause damage to an individual's reputation . . . ."); *Greenmoss Builders, Inc.*, 472 U.S. at 762 ("[N]o special [First Amendment] protection [applies] when . . . speech is wholly false and clearly damaging to the victim's business reputation."); *Keeton*, 465 U.S. at 776 ("False statements of fact harm both the subject of the falsehood and the readers of the statement." (emphasis omitted)); *Herbert*, 441 U.S. at 172 ("Those who publish *defamatory* falsehoods . . . are subject to liability . . . ." (emphasis added)); *Time, Inc. v. Hill*, 385 U.S. at 384 n.9 (recognizing state interest in providing recovery for false light invasion of privacy because "the primary damage is the mental distress from having been exposed to public view").

*Schenck v. United States*, 249 U.S. 47, 52 (1919) (Holmes, J.); *see also Garrison*, 379 U.S. at 70 (holding that Louisiana's criminal libel law was not "narrowly drawn" because it did not require a finding of "clear and present danger" and was not limited "to speech calculated to cause breaches of the peace"); *Chaplinsky*, 315 U.S. at 572 (describing the categories of unprotected speech as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace"). Thus, if there is an unprotected category to be divined from the Court's jurisprudence, it is comprised of a discrete subset of false factual statements—that is, the *injurious falsehood*.

**III.**

The conclusion that I derive from this survey of the Supreme Court's false-statement jurisprudence is consistent with the guideposts that the Court has articulated for discerning categories of unprotected speech. Specifically, the teaching of *Stevens* and the Court's earlier related cases is that, ordinarily for speech to be categorically excepted from the protections of the First Amendment, it generally must be "*historically* unprotected." *Stevens*, 130 S. Ct. at 1586 (emphasis added); *see also R.A.V.*, 505 U.S. at 383 (referring to the categories as "traditional limitations"); *Simon & Schuster*, 502 U.S. at 127 (Kennedy, J., concurring in the judgment) (calling them "historic and traditional categories long

18

familiar to the bar").[9]  The historical record supports the conclusions that I have drawn from the Supreme Court's false-statement cases.  Specifically, our legal traditions suggest that the "naked lie"—the knowingly false statement unattended by harmful consequence—is beyond the province of the law to punish, and that only the injurious falsehood has historically been subjected to legal sanction.

**A.**

Historically and at common law, lying, without more, was not considered a criminal offense.  *See* 4 William Blackstone, *Commentaries* *41–42 ("The vice of lying, which consists (abstractedly taken) in a criminal violation of the truth, and therefore in any shape is derogatory from found morality, is not however taken notice of by our law, unless it carries with it some public inconvenience, as spreading false news; or some social injury, as slander and malicious prosecution, for which a private recompence is given."); *see also State v. Karel*, 129 So. 703, 704 (Fla. 1930) ("[A] mere naked lie, an improbable lie or an absurd or irrational assertion, or a mere idle tale, or a device so shallow as to be incapable of imposing upon any person, is not indictable."); *Commonwealth v. Shaver*, 3 Watts

---

[9]  However, I recognize that this is not a hard and fast rule.  Historic regulation of a category of speech is neither necessary, *see New York v. Ferber*, 458 U.S. 747, 763–64 (1982), nor sufficient, *see Cohen v. California*, 403 U.S. 15, 19–20 (1971), for the category's continued canonical status.  *See Simon & Schuster*, 502 U.S. at 127 (Kennedy, J., concurring in the judgment) (listing various categories and stating that "it cannot be said with certainty that the foregoing types of expression are or will remain the only ones that are without First Amendment protection").

& Serg. 338, 1842 WL 4918, at *3 (Pa. 1842) ("[T]here are also many evil practices of which a man may be guilty, . . . [such as] lying, which may be said to lie at the root of almost all moral obliquity, for which he cannot be indicted or punished by law . . . ."); *Commonwealth v. Wilgus*, 21 Mass. (4 Pick.) 177, 186 (1826) ("A mere naked lie may not be sufficient to sustain an indictment on this statute, for it is not the policy of government to punish criminally every wrong which is committed.").  To be indictable, a lie had to occasion some public injury. *See Commonwealth v. Sharpless*, 2 Serg. & Rawle 91, 1815 WL 1297, at *8 (Pa. 1815) (Yeates, J.) ("[A]lthough every immoral act, such as lying, etc., is not indictable, yet where the offence charged is destructive of morality in general; where it does or may affect every member of the community, it is punishable at common law."); 4 Blackstone, *supra*, at *41–42.  Thus, fraud tending to cause injury to the public was indictable.  *See People v. Stone*, 9 Wend. 182, 188 (N.Y. Sup. Ct. 1832) ("[I]n order to render a cheat or fraud indictable at common law, on the ground that it was effected by means of a false token,[10] the token must be such as indicates a general intent to defraud, and therefore is an injury to the public." (emphases omitted)); *cf. Lewis v. Commonwealth*, 2 Serg. & Rawle 551, 1816 WL 1579, at *1 (Pa. 1816) ("It is not every cheat, indeed, which may be so

---

[10]    A false token is "a false document or sign of the existence of a fact, in general, used for the purpose of fraud."  *Black's Law Dictionary* 603 (6th ed. 1990); *see also Black's Law Dictionary* 1625 (9th ed. 2009) (defining "false token" as "[a] counterfeit coin, bill, or the like").

punished; one may cheat another, by barely telling a lie, to deceive him in the quality of goods sold, &c.; such deception would not be subject to an indictment; but a cheat which affects the *public* is indictable.").[11]  Libel was also indictable because its written form and calumnious character tended to "cause a disturbance of the public peace."  *State v. Avery*, 7 Conn. 266, 1828 WL 77, at *3 (1828); *see also* 2 James Kent, *Commentaries on American Law* *17 (New York, E. B. Clayton, 3d ed. 1836) ("[T]he law has accordingly considered [libel] in the light of a public as well as a private injury, and has rendered the party . . . answerable to the state by indictment, as guilty of an offence tending directly to a breach of the public peace.").

Spreading false news was also a crime at common law.  4 Blackstone, *supra*, at *149.  The American colonies had laws to this effect, punishing any person "who shall wittingly and willingly make or publish any lie which may be pernicious to the common weal."  Larry D. Eldridge, *Before Zenger: Truth and Seditious Speech in Colonial America, 1607-1700*, 39 Am. J. Legal Hist. 337, 352

---

[11]      *See also State v. Newell*, 1 Mo. 248, 1822 WL 1474, at *2 (1822) ("If a man tells a positive lie, the fact of lying, alone, is not a pretense within the statute; but the moment he uses that lie to effect an object to the disadvantage of another, it is a false pretense."); *State v. Wilson*, 9 S.C.L. (2 Mill) 135, 1818 WL 753, at *1–2 (S.C. Const. Ct. App. 1818) (criticizing an indictment for false representation in the sale of a slave for alleging that the defendants' statements were "falsely" asserted because this did not amount to an allegation of *mens rea*, and stating, "[t]he assertion, then, was only false because it was not true, to which neither moral nor legal guilt can attach"; and further holding that because the false representation did not occur by a false token, it was "but a naked lie, and however reprehensible, is not indictable").

(1995) (quoting a 1645 Massachusetts statute) (internal quotation marks omitted).

Over time, however, colonial prosecutions for this offense became rare; the

preferred remedy was to combat falsehood with truth. *See id.* at 356

("Increasingly, as the [seventeenth] century went on, colonial officials simply

investigated rumors and did little except publicly declare them to be false . . . .").

In civil actions, liability also could not be founded on a false statement

unless it caused the plaintiff injury. Thus, for civil fraud, "[a] mere naked lie—a

falsehood—though told with intent to deceive, upon which nobody acts, and by

which nobody is deceived, is not actionable." *Town of Enfield v. Colburn*, 63

N.H. 218, 1884 WL 3547, at *2 (1884); *Irwin v. Sherril*, 1 N.C. (Tay.) 99, 1799

WL 112, at *2 (N.C. Super. Ct. L. & Eq. 1799) ("So it is for telling a bare, naked

lie, the truth or falsehood of which were alike unknown to the defendant; no

action is maintainable; but where it is uttered by a person who, at the time, knew

its falsehood, and a loss afterwards ensues to the plaintiff in consequence of it, an

action will lie.").[12] Similarly, a defamatory or libelous falsehood was by

_____

[12]     *See also Green's Adm'r v. Bryant*, 2 Ga. 66, 1847 WL 1240, at *2
(1847) (holding that defendant's false statement was not a "naked lie" and was
therefore actionable because defendant "knew better than the plaintiff what . . .
[the truth was]; the representation was wilfully false; it was made for his, the
defendant's, benefit; he was interested in it; [and] *by it he pocketed some five
hundred dollars of the plaintiff's money*" (emphasis added)); *Benton v. Pratt*, 2
Wend. 385, 390 (N.Y. Sup. Ct. 1829) (holding that a false representation was not
a "bare, naked lie" and was actionable because there was "the assertion, on the
part of the defendant, of an unqualified falsehood, with a fraudulent intent as to a
present or existing fact, and a direct, positive and material injury resulting

(continued...)

22

definition injurious.  *See Lyle v. Clason*, 1 Cai. R. 581 (N.Y. Sup. Ct. 1804) ("The

basis of the action [for libel] is damages for the injury to character in the opinion

of others." (emphasis omitted)); 2 Kent, *supra*, at *16–17 ("A libel . . . has been

well defined to be a malicious publication, . . . tending either to blacken the

memory of one dead, or the reputation of one alive . . . .  A malicious intent . . . ,

and an injurious or offensive tendency, must concur to constitute the libel."

(footnote omitted)); *see also* Restatement (Second) of Torts § 559 (1977) ("A

communication is defamatory if it tends so to harm the reputation of another as to

---

[12](...continued)
therefrom to the plaintiff"); *Farrar v. Alston*, 12 N.C. (1 Dev.) 69, 1826 WL 267,
at *1 (1826) ("When no loss is occasioned by a falsehood, an action for a deceit
will not lie . . . ."); *Lang v. Lee*, 24 Va. (3 Rand.) 410, 1825 WL 954, at *6 (1825)
("Fraud without damage, or damage without fraud, gives no cause of action; but
where these two do concur, there, an action lieth." (citation omitted) (internal
quotation marks omitted)); *Otis v. Raymond*, 3 Conn. 413, 1820 WL 30, at *4
(1820) ("To sustain the action . . . [for fraudulent misrepresentation of facts],
there must have been a fraud committed by the [defendant], and damages
resulting from it to the [plaintiff]."); *Pasley v. Freeman*, (1789) 100 Eng. Rep.
450, 453 (K.B.) (Buller, J.) ("[A]n action cannot be supported for telling a bare
naked lie; but that I define to be, saying a thing which is false, knowing or not
knowing it to be so, and without any design to injure, cheat, or deceive, another
person.  Every deceit comprehends a lie; but a deceit is more than a lie on account
of the view with which it is practised, it's [sic] being coupled with some dealing,
and the injury which it is calculated to occasion, and does occasion, to another
person."); *cf. Moore v. Turbeville*, 5 Ky. (2 Bibb) 602, 1812 WL 644, at *1 (1812)
("That a misrepresentation or suggestion of a falsehood with respect to a fact of
this kind, whereby another is deceived, is a violation of good faith, and
consequently a deviation from the rules of moral rectitude, must be admitted.  It
however does not necessarily follow, that it is sufficient to induce a right of
action.  There are many instances in which a person may be guilty of a moral
delinquency, without incurring a[]legal responsibility; for[]legal obligations are
necessarily more circumscribed in their nature than moral duties.").

23

lower him in the estimation of the community or to deter third persons from associating or dealing with him.").  And where the falsehood did no harm—either because it was not published to a third person, did not refer to the plaintiff, or did not otherwise cause injury—there was no liability.  *See Miller v. Maxwell*, 16 Wend. 9, 15–16 (N.Y. Sup. Ct. 1836) ("[I]t is obvious that the publication must describe the plaintiff with sufficient certainty to enable his personal acquaintances, on reading it, to apply to him the slanderous imputations; if not, however gross the charges, it is no libel upon him . . . ."); Thomas McIntyre Cooley, *A Treatise on the Law of Torts* 225 (Chi., Callaghan & Co., 2d ed. 1888) ("The reputation is not assailed, and cannot presumably be injured when the false charge is made only to the party himself."); 3 William Blackstone, *Commentaries* *124 ("But mere scurrility, or opprobrious words, which neither in themselves import, nor are in fact attended with, any injurious effects, will not support an action [for defamation].").[13]

**B.**

---

[13]     *See also Sheffill v. Van Deusen*, 79 Mass. (13 Gray) 304, 304–05 (1859) ("No . . . injury is done when the words are uttered only to the person concerning whom they are spoken . . . .  It is damage done to character in the opinion of other men, and not in a party's selfestimation [sic], which constitutes the material element in an action for verbal slander."); *McIntosh v. Matherly*, 48 Ky. (9 B. Mon.) 119, 1849 WL 5393, at *1 (1848) ("The injury to the plaintiff's character in public estimation, is the basis of the action [for slander].  If the slander is not published or made known to others, his character cannot be affected by it, and a suit of slander for the private injury cannot be maintained[.]").

Several federal statutes in place at or around the time that the First Amendment came into force penalized false statements. The types of false statements penalized were few, but none is surprising. They are the types that continue to be subject to sanction today, without constitutional objection: perjury and false statements knowingly made to a government agency or concerning a matter within an agency's jurisdiction. These statements injure, or perhaps more often pose a significant risk of injuring, governmental processes.

There was the proscription and punishment of perjury. *See* An Act for the Punishment of certain Crimes against the United States, § 18, 1 Stat. 112, 116 (1790) (prescribing imprisonment and fines for "any person [who] shall wilfully and corruptly commit perjury . . . on his or her oath or affirmation in any suit, controversy, matter or cause depending in any of the courts of the United States"). Relatedly, a 1798 federal statute authorized congressional officeholders to "administer oaths or affirmations to witnesses, in any case under their examination" and punished "any person [who] shall wilfully, absolutely and falsely swear or affirm, touching any matter or thing material to the point in question, whereto he or she shall be thus examined." An Act to authorize certain Officers and other persons to administer oaths, §§ 1–2, 1 Stat. 554, 554 (1798).

False statements to the government were also subject to legal sanction. Some laws required a person to swear or affirm regarding a matter bearing on some area of federal regulation and criminalized the giving of a false oath or

25

affirmation. *See, e.g.*, An Act for the relief of persons imprisoned for Debt, § 3, 1 Stat. 482, 482 (1796) (prescribing criminal penalties for a bankrupt debtor's swearing falsely with respect to his property); An Act concerning certain Fisheries of the United States, and for the regulation and government of the Fishermen employed therein, § 8, 1 Stat. 229, 232 (1792) (prescribing criminal penalties for falsely swearing that a ship was actually employed at sea in order to obtain a federal subsidy); An Act for Registering and Clearing Vessels, Regulating the Coasting Trade, and for other purposes, § 36, 1 Stat. 55, 65 (1789) ("That if any person or persons shall falsely make oath or affirmation to any of the matters herein required to be verified [relating to the federal registration of ships and vessels], such person or persons shall suffer the like pains and penalties, as shall be incurred by persons committing wilful and corrupt perjury . . . .").[14]

There was a third type of false statement punished in the early years of the Republic, embodied in the infamous Sedition Act of 1798. Criminal penalties

---

[14]    Viewed from this historical perspective, the majority's listing of federal statutes that currently criminalize the making of false factual statements is hardly remarkable. *See* Maj. Op. at 32–34. These statutes generally resemble those that were in existence around the time that the First Amendment was adopted—statutes that proscribe speech causing an injury, or posing a significant risk of doing so, to governmental processes. Contrary to the majority's suggestion, *id.* at 32 ("[T]he Stolen Valor Act does not stand alone."), the existence of these statutes does not dispel the idea that the Stolen Valor Act is an outlier in that it proscribes false factual statements that have no necessary nexus at all to an injury or to a significant risk of one—be it to an individual or to government processes.

26

were prescribed for "any person [who] shall write, print, utter or publish . . . any false, scandalous and malicious writing . . . against the government of the United States, . . . with intent to defame the said government." Sedition Act, § 2, 1 Stat. 596, 596 (1798). The Act expired by its terms in early 1801, *id.* § 4, 1 Stat. at 597, and the question of its constitutionality never reached the Supreme Court. However, it was roundly condemned at the time as violating the First Amendment, and that opinion "has carried the day in the court of history." *Sullivan*, 376 U.S. at 275–76.

## C.

The historical record regarding false-statement liability reveals a caution and prudence in subjecting false statements to legal sanction. The "naked lie," though morally objectionable, was not legally punishable, and a false statement did not incur liability unless it occasioned some injury, whether private or public. *See* 4 Blackstone, *supra*, at *41–42. The early federal proscriptions on perjury and false statements to the government are consistent with a concern about public injury. Thus, if the historical record reveals any false-statement category long subject to regulation, it is, at a minimum, the injurious falsehood—that is, a false statement of fact that causes, or poses a significant risk of causing, harm.

The focus in our legal tradition on the injurious falsehood is entirely consistent with the Supreme Court's false-statement jurisprudence. What the historical record demonstrates is that there is no unitary, all-encompassing false-

27

statement-of-fact category that has been long subject to unobjected-to restriction. To the contrary, in the American tradition, the "naked lie"—i.e., the unadorned falsehood—is not subject to legal sanction.

## IV.

Our legal tradition's view of false-statement liability—a narrow one that is restricted to the injurious falsehood—deserves great weight in our constitutional analysis, not only because *Stevens* so instructs us, but also because the tradition has much to commend it. I therefore cannot agree with the majority that a knowingly false statement of fact (even one made with an intent to deceive) is *inherently* valueless and, therefore, undeserving of First Amendment protection.

## A.

In the first place, as the Supreme Court has repeatedly recognized, false statements are "inevitable in free debate." *Hartlage*, 456 U.S. at 60–61 (quoting *Sullivan*, 376 U.S. at 271–72) (internal quotation marks omitted); *Gertz*, 418 U.S. at 340; *Time, Inc. v. Hill*, 385 U.S. at 388; *see also Cantwell*, 310 U.S. at 310. Relatedly, disentangling the false from the true is often a task fraught with problems. *Time, Inc. v. Pape*, 401 U.S. at 286 ("The question of the 'truth' . . . presents rather complicated problems."); *Sullivan*, 376 U.S. at 271 ("Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth . . . ."). As Justice Jackson noted well,

28

> it cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.

*Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring). Indeed, the notion that the marketplace of ideas provides a proving ground for truth necessarily assumes that error is part of the process. *Sullivan*, 376 U.S. at 279 n.19 ("Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" (quoting John Stuart Mill, *On Liberty* 15 (Oxford, Blackwell 1947))); *see also Dun & Bradstreet, Inc. v. C. R. Grove*, 404 U.S. 898, 900 (1971) (Douglas, J., dissenting from the denial of a writ of certiorari) ("[E]ven false statements perform an important function. *Whether intentional*, whether false, all opinions and *allegations* in this forensic community are catalytic elements which tend to cause us to react, to rethink, and to reply." (emphases added)).

Second, false statements are not all of a piece. They run the gamut from harmful, to benign, to salutary. *See United States v. Alvarez*, 638 F.3d 666, 674–75 (9th Cir. 2011) (Kozinski, C.J., concurring in the denial of rehearing en banc). In that sense, they are precisely like every other form of speech—biography, opinion column, academic article, or box-office hit, to name a

few—that presumptively enjoys constitutional protection. *See Stevens*, 130 S. Ct. at 1591 ("Most of what we say to one another lacks religious, political, scientific, educational, journalistic, historical, or artistic value (let alone serious value), but it is still sheltered from government regulation." (emphasis omitted) (internal quotation marks omitted)). If "(w)holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons," *Cohen*, 403 U.S. at 25 (alteration in original) (quoting *Winters v. New York*, 333 U.S. 507, 528 (1948) (Frankfurter, J., dissenting)), then surely the little white lies (even those knowingly told and designed to deceive) that season our speech, like a beneficent salt, and preserve the grace and dignity of human relationships, are likewise sheltered.

**B.**

Thus, I am troubled by the majority's conclusion that false statements of fact—even those that are knowingly made, with an intent to deceive—are categorically outside the protective walls of the First Amendment and are given shelter only as a means to some other end, namely, protecting other "speech that matters." According to the majority, this so-called "breathing space" analysis is well-grounded in Supreme Court precedent. Maj. Op. at 20 ("Thus, the Supreme Court has expressly stated that, although laws punishing false statements must afford adequate breathing space to protected speech, knowingly false factual statements are not intrinsically protected under the First Amendment."). I beg to

30

differ.  The majority's analysis rests on little more than statements from the Court's opinions that are selectively quoted and used out of context.  At bottom, as the Ninth Circuit put it, "we [should] not [be] eager to extend . . . statement[s] (often quoted, but often qualified) made in the complicated area of defamation jurisprudence into a new context in order to justify an unprecedented and vast exception to First Amendment guarantees."  *United States v. Alvarez*, 617 F.3d 1198, 1208 (9th Cir. 2010).

It is true, of course, that what the Court has said in dicta is entitled to great weight and binds us "almost as firmly as . . . the Court's outright holdings."  *United States v. Langford*, 641 F.3d 1195, 1198 n.2 (10th Cir. 2011) (quoting *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007)) (internal quotation marks omitted).  That does not, however, negate our obligation to investigate and determine what the Court has *actually* said.  In this vein, the Court has cautioned us that dicta in its First Amendment jurisprudence should be taken "in context."  *See R.A.V.*, 505 U.S. at 383.  It has also warned against simplistic reliance on statements found in its past opinions.  *See Garrison*, 379 U.S. at 67 n.3.  Finally, let us be honest: Nothing in the Supreme Court's First Amendment jurisprudence affirmatively controls this case.  Our judicial task, then, consists of more than quote mining.  Establishing for the first time a new category of unprotected speech, as the majority does, for knowingly false

statements of fact—something the Supreme Court has *never* done—must hang on more than the slender thread that the majority supplies.

So it is worthwhile, I think, to step back and consider the consequences of the majority's decision. Henceforth, every falsehood—no matter where uttered, no matter how inconsequential—may be regulated, even criminally punished, so long as it is knowingly made, with an intent to deceive. The government need not come forward with any compelling purpose, much less a means narrowly tailored to achieve it. The awesome breadth of this censorial power is staggering. The slightest mendacity—"I'm busy tonight," "I don't have cash on me," "I used to walk to school, uphill, through three feet of snow"—may now be subject to criminal sanction unchecked by the First Amendment, unless after the fact *the speaker* can demonstrate that protecting his utterance is somehow necessary to protect other "speech that matters," or unless his speech falls into the majority's vaguely defined safe harbor because it is ironic, rhetorical, artistic and the like. This is strange terrain for the First Amendment.

To begin with, the majority turns customary First Amendment analysis on its head. It is rudimentary, so I had thought, that content-based speech restrictions are presumptively unconstitutional and that the government is charged with justifying them. *See Stevens*, 130 S. Ct. at 1584. The government is required to show either that the restriction meets strict scrutiny, or that the speech falls into an identified category that warrants less rigorous review and that it

32

satisfies the requirements of that review. *See Brown*, 131 S. Ct. at 2733, 2738. It is not *the speaker*'s burden to show why his speech should be unregulated. *See Playboy Entm't*, 529 U.S. at 816 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

Second, the majority's holding invites precisely the sort of balancing test that earned the Court's stern rebuke in *Stevens*. The notion that the government may regulate an entire category of speech unless *speakers* can demonstrate, to a court's satisfaction, that the speech is of sufficient social importance is anathema to our First Amendment tradition.[15] *See Stevens*, 130 S. Ct. at 1585. Indeed, it is inimical to the concerns animating the First Amendment. *See id.* The point of the First Amendment was to do away with such balancing, to minimize to the vanishing point the government's interference with citizens' speech. *Cohen*, 403 U.S. at 24 ("[The First Amendment] is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision

---

[15]     It bears mention that under the rule the majority lays out, it would not be enough even to show that an uttered falsehood is *itself* of sufficient social importance. The false statement, we are told, is never protected *for its own sake*. Thus, for example, it would not be enough for a speaker to show that telling a lie in a given circumstance was necessary to save a person's life or to preserve the speaker's privacy. Protection of that kind of lie ordinarily would not be necessary to protect *other speech* that matters, and the speaker could be made to answer criminally. Perhaps there are theories under which the speaker could escape punishment. But one thing is clear: he could not count on his speech being protected.

as to what views shall be voiced largely into the hands of each of us . . . .").[16]

Absent adherence to that constitutional principle, one of our most fundamental liberties would lie prostrate before the ever-pressing urgency of the moment, the vascillating sensibilities of the populace, and some legislators' views on which utterances are and are not socially desirable.  Our nation ratified the First Amendment precisely *because* we do not trust ourselves to strike the balance appropriately on a case-by-case basis.  *See Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010) ("*Premised on mistrust of governmental power*, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." (emphasis added)).  To be sure, the First Amendment is "the very *product* of an interest-balancing," *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), but it is one that was done "by the people," *id.*, at the time of its adoption, *see Stevens*, 130 S. Ct. at 1585 ("The First Amendment's guarantee of

---

[16]        The majority's attempt to side-step this point is entirely unpersuasive.  The majority asserts that breathing space analysis is "not a balancing test in any ordinary sense" but rather is "more aptly characterized as a specific method of review the Court uses to assess laws regulating false factual statements," which is allegedly akin to strict scrutiny and the other forms of review applied in the constitutional arena.  Maj. Op. at 28–29.  However, the majority cites to no legal authority to validate this characterization of its breathing space analysis.  Moreover,  we are left to wonder under the majority's posited breathing space review what legal principles courts should employ in determining what speech matters and, perhaps more perplexing, how much breathing space is enough.  Indeed, notwithstanding the majority's protestations, it is clear that its breathing space review actually contemplates a balancing test: courts must determine what speech matters (i.e., balancing the speech at issue against other forms of speech), and presumably depending on how important they determine that speech to be, decide how much breathing space is necessary.

34

free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs."); *see also Brown*, 131 S. Ct. at 2759 n.2 (Thomas, J., dissenting) ("The question is not whether certain laws might make sense to judges or legislators today, but rather what the public likely understood 'the freedom of speech' to mean when the First Amendment was adopted."). Yet, the unacceptable risk of case-by-case balancing is reconstituted in the majority's newly minted breathing space analysis.[17]

I recognize, of course, that the Supreme Court has often *described* protection for false statements as being justified by the need to protect "speech that matters." *See Gertz*, 418 U.S. at 341. "But such descriptions are just that—descriptive." *Stevens*, 130 S. Ct. at 1586.

> They do not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits [in a First Amendment challenge to a statute] tilts in a statute's favor.

---

[17] Thus, as well-intentioned as they may be, the majority's suggestion that the public should take comfort in the fact that "the judiciary will continue to scrutinize arbitrary and irrational legislative enactments," and its assurance that the public generally may rely on legislators' "judgment . . . [to] refrain from enacting outrageous laws that encroach upon the ability of the individuals to voice their opinions, converse with fellow citizens, and go about their lives," Maj. Op. at 12 n.6, effectively ignore the fundamental mistrust of government that animates the restrictions of the First Amendment.

*Id.*  *Gertz*—the source of the "speech that matters" language—was concerned with a *defamatory* falsehood, and I have no doubt that *that* sort of falsehood, due to the injury it occasions, *is* categorically outside of the First Amendment's heightened protections.  However, the majority attempts through its breathing space analysis to extend *Gertz* outside of the context of injurious falsehoods, like defamation, and that is where its analysis falters.[18]

---

[18]   The majority's attempt to demonstrate that its breathing space analysis extends beyond the defamation context is wholly unpersuasive. Specifically, the majority asserts: "[M]ost importantly, these [breathing space] principles extend well beyond the narrow context of defamation."  Maj. Op. at 23. And then it offers a string-cite that supposedly establishes this point.  However, it is significant that overwhelmingly the cases that the majority cites involve restrictions on injurious speech—speech that actually injures, or that poses a significant risk of injuring, certain individuals, or governmental processes: that is, speech involving fraud, false-light invasion of privacy, intentional infliction of emotional distress through false statements, trade libel, falsehoods that are likely to lead to physical harm, falsehoods that are likely to provoke a public panic—i.e., harm to individuals; and speech involving perjury, unsworn false statements of fact made to governmental officials, false statements regarding university degrees and professional licenses, falsehoods in connection with political campaigns—i.e., harm to governmental processes.  Generally speaking, I do not dispute that such injurious speech has historically been subject to governmental regulation.  However, the proscriptions of the Stolen Valor Act sweep much more broadly than these laws to reach false statements of fact about military medals that neither cause nor threaten any actual harm at all.  Indeed, as the majority notes: "Under the plain terms of the Act . . . [i]t is inconsequential whether the lie induced reliance or caused discrete harm."  *Id.* at 9.  Similarly, the six contexts to which the majority suggests that the Supreme Court has extended breathing space principles either "expressly or implicitly," *id.* at 24, reflect harm to persons or threatened harm to governmental processes.  Accordingly, I do not find persuasive the majority's attempt to demonstrate that its *Gertz*-based breathing space analysis extends beyond the context of injurious falsehoods, like defamation.

36

Perhaps worst of all, the majority's rule invites a case-by-case consideration of the importance of speech only *after* the fact—specifically, only *after* the penal or prosecutorial forces of the State have arrayed against the speaker. No speaker could know his fate in advance. He would be left to hope that a court would find a sufficient link between his "valueless" false speech and some nebulous cluster of "important" speech, such that he might benefit from the First Amendment's protection. I agree with Judge Smith, *Alvarez*, 638 F.3d at 673 (Smith, M., J., concurring in the denial of rehearing en banc): this would be a truly Kafkaesque world. *See Gertz*, 418 U.S. at 343–44 ("[Case-by-case balancing] would lead to unpredictable results and uncertain expectations, and it could render our duty to supervise the lower courts unmanageable. Because an ad hoc resolution of the competing interests at stake in each particular case is not feasible, we must lay down broad rules of general application.").

The constitutional infirmity of such after-the-fact burden-shifting is highlighted in two Supreme Court decisions. *See Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003); *Riley v. Nat'l Federation of the Blind of N.C., Inc.*, 487 U.S. 781 (1988). In *Riley*, the Court confronted a state law prohibiting professional fundraisers, who were engaged in charitable solicitation, from retaining an "unreasonable" fee. 487 U.S. at 784. Fees exceeding thirty-five percent were deemed unreasonable unless the fundraiser could show on a case-by-case basis either that the solicitation involved advocacy

37

or information dissemination, or that, absent the higher fee, the charity's ability to raise money or communicate would be significantly diminished. *Id.* at 785–86. The law's purpose was fraud prevention, and while the Court recognized the State's substantial interest therein, it struck down the law as not narrowly tailored to that end. *See id.* at 792–93.

The Court's first conclusion was that a percentage-based fee measure lacked a sufficient nexus to the potential for fraud. *See id.* at 793. But, significantly for our purposes, the law "suffer[ed] from a more fundamental flaw." *Id.* It "require[d] *the speaker* to prove 'reasonableness' case by case based upon what is at best a loose inference that the fee might be too high." *Id.* (emphasis added). The fundraiser bore the burden in each case to rebut the presumption of unreasonableness. *Id.* Furthermore, even if the fundraiser could show that its solicitation involved advocacy or the dissemination of information, that was not alone sufficient; it was "merely a factor that is added to the calculus submitted to the factfinder, who may still decide that the costs incurred or the fundraiser's profit were excessive." *Id.* The Court was not comforted, moreover, by the government's assurance that standards for determining reasonable fundraising fees would be "judicially defined over the years." *Id.* (citation omitted) (internal quotation marks omitted). "Speakers," the Court said, "cannot be made to wait for 'years' before being able to speak with a measure of security." *Id.* at 793–94.

38

> In the interim, fundraisers will be faced with the knowledge that every campaign incurring fees in excess of 35% . . . will subject them to potential litigation over the "reasonableness" of the fee. And, of course, in every such case the fundraiser must bear the costs of litigation and the risk of a mistaken adverse finding by the factfinder, even if the fundraiser and the charity believe that the fee was in fact fair. *This scheme must necessarily chill speech in direct contravention of the First Amendment's dictates.*

*Id.* at 794 (emphasis added).

*Riley*'s lesson was reiterated in *Telemarketing Associates*, which involved a civil fraud action by the State of Illinois against certain fundraising organizations. The State's complaint was brought pursuant to Illinois's common law of fraud, under which, as the Court noted, "[f]alse statement alone" was insufficient for liability. 538 U.S. at 620. Rather, the State was required to establish by clear and convincing evidence that a factual representation was knowingly false, was made "with the intent to mislead the listener," *and* was successful in doing so (i.e., caused some injury). *Id.* These "[e]xacting proof requirements . . . provide[d] sufficient breathing room" for the First Amendment, the Court found, and it upheld the complaint as "properly tailored" to the State's interest in protecting the public from fraud. *Id.* Significantly, the Court's opinion contained the following discussion:

> In *Riley*, this Court expressed concern that case-by-case litigation over the reasonableness of fundraising fees would inhibit speech. . . . The Court has long cautioned that, to avoid chilling protected speech, the government must bear the burden of proving that the speech it seeks to prohibit is unprotected. *The government shoulders that burden in a fraud action.*

39

*Id.* at 620 n.9 (emphasis added) (citations omitted).

If the First Amendment places the burden on the government and bars case-by-case balancing in an action for *civil* fraud, then *a fortiori* the First Amendment should operate in the same manner in a *criminal* action based upon a false statement of fact (even one knowingly made with an intent to deceive)—after all, in the latter type of action, significant social stigma and possibly liberty itself is at stake. *See Reno*, 521 U.S. at 872 (stating that criminal penalties "pose[] greater First Amendment concerns" than civil regulations because "[i]n addition to the opprobrium and stigma of a criminal conviction, . . . [t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate"). On this basis, I conclude that the majority's breathing space review is actually a condemned balancing test by another name and, as such, ill-conceived.

## V.

Based on the above review of the Supreme Court's jurisprudence and the historical record, I conclude that the Stolen Valor Act may not be read as targeting speech that is categorically excepted from the First Amendment's rigorous protections, unless it may be said that it targets injurious falsehoods—injurious either to one or more individuals or to governmental processes. Because I do not believe that it is susceptible to such a reading, I

40

conclude that the Stolen Valor Act criminalizes protected speech and, because it is content-based, it is subject to strict scrutiny.

For analytical purposes, we might distinguish between two types of injury that false statements produce. The first is direct injury: injury caused by the very utterance of a false statement. Defamatory and other tortiously false speech are examples of directly injurious falsehoods. *See Keeton*, 465 U.S. at 776 ("[Libelous statements] harm both the subject of the falsehood and the readers of the statement." (emphasis omitted)); *Time, Inc. v. Hill*, 385 U.S. at 384 n.9 ("[In false light invasion of privacy,] the primary damage is the mental distress from having been exposed to public view."). Perjury, too, may exhibit this quality because it is thought to harm the "integrity of the legal system." *See United States v. Holland*, 22 F.3d 1040, 1047 (11th Cir. 1994) ("Perjury, regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system . . . ."). The second form of injury is indirect, such that the falsehood does not *itself* do harm, but injury results when there is a subsequent act (or failure to act)—or a significant risk of the same—in reliance on the falsehood. Of this, fraud and false commercial speech are ready examples. *See* 2 Am. Jur. 2d *Fraud and Deceit* § 23 (2011) (describing elements of fraud as including "action . . . taken in justifiable reliance upon the representation").[19]

---

[19] I note that *Chaplinsky* hints at this distinction between the directly and the indirectly injurious when it describes the categories of unprotected speech

(continued...)

The most glaring problem with the Stolen Valor Act is the absence of a nexus between the proscribed "false[] represent[ation]" and any resulting injury. For three reasons, the Act is not an injurious-falsehood regulation: (1) By its terms, the Act does not require a showing that a defendant's false statement of fact caused a particular injury (i.e., it does not contain an injury or harm element); (2) the Act plainly is not designed in a manner that is calculated to target any form of indirect injury; and (3) the government's claim that the false claims that the Act proscribes inflict a generalized harm on the "reputation and meaning" of military awards is unpersuasive, notably because those claims are not sufficiently analogous to the kinds of speech that have been permissibly proscribed, without a particularized showing of harm.

**A.**

The sum and substance of the Stolen Valor Act is this: "Whoever falsely represents himself . . . to have been awarded any [military] decoration or medal authorized by Congress . . . shall be fined . . . , imprisoned . . . , or both."  18 U.S.C. § 704(b).  That language, on its face, does not require any demonstration that a defendant's false statement concerning military medals or awards caused a specific injury.  For example, the Act does not require a particularized showing of direct injury—i.e, proof of some nexus between a defendant's false claim and the

[19](...continued)
as "those which by their very utterance inflict injury *or* tend to incite an immediate breach of the peace."  315 U.S. at 572 (emphasis added).

42

resulting diminution of the "reputation" and symbolic meaning of military awards. Nor does the Act oblige the government to establish that a defendant caused another person to detrimentally rely on his false statement (such as by voting for a defendant or donating to his cause)—i.e., to demonstrate an indirect harm. Consequently, even under the majority's limiting construction (i.e., a *mens rea* of knowingly with intent to deceive), the Act still covers falsehoods that are patently harmless, such as Grandpa's puffed-up war stories over Thanksgiving turkey.

**B.**

The Act plainly is not designed in a manner that is calculated to regulate an indirectly injurious falsehood. Apart from the lack of any facial requirement of indirect injury, the Act is not limited to situations in which a significant risk of such an injury is evident. An example by comparison may illustrate.

18 U.S.C. § 2074 makes it a crime to "knowingly issue[] or publish[] any counterfeit weather forecast or warning of weather conditions falsely representing such forecast or warning to have been issued or published by the Weather Bureau, United States Signal Service, or other branch of the Government service." While this statute does not on its face require a nexus between a false weather report and a resulting indirect injury, the statute's aim is evident: to prevent unscrupulous prevaricators both from inciting public panic through false warnings of inclement weather and from lulling the public into a false sense of security through

43

deceptive assurances of sunny skies. Criminal punishment also seems particularly

appropriate in this context because attempts to combat false weather reports may

be ineffective (indeed, they may only sow confusion) and truthful reports may not

arrive in time to undo damage already done. Notably, too, § 2074 contains

limitations. In addition to a "counterfeit" forecast of weather conditions, the

statute requires that the forecast be "issue[d] or publishe[d]" and that it falsely

bear the government's endorsement.

The Stolen Valor Act is insufficiently analogous to this kind of statute.

False claims of military honor—even when knowingly made, with an intent to

deceive—do not risk any imminent "breach of the peace," such as a public panic.

*Cf. Chaplinsky*, 315 U.S. at 572 (characterizing unprotected speech as that which

"tend[s] to incite an immediate breach of the peace"); *Schenck*, 249 U.S. at 52

("The most stringent protection of free speech would not protect a man in falsely

shouting fire in a theatre and causing a panic."). And the Act is not limited to

situations in which the risk of detrimental reliance is palpable, such as false

claims at a fundraising event or in the context of charitable solicitations. *Cf.*

*Telemarketing Assocs.*, 538 U.S. at 612 ("[F]raudulent charitable solicitation is

unprotected speech.").

## C.

Rejecting the notion that statutes proscribing false statements must contain

a harm element that must be proved in every case, the government contends that

the false claims of military honor addressed by the Stolen Valor Act inflict a generalized harm and, more specifically, that "the cumulative effect of false claims undermines the reputation and meaning of the awards." Aplt. Opening Br. at 21. In this regard, the government identifies obscenity and perjury as categories of speech that have been permissibly proscribed, though they do not "involve individualized harms." *Id.* at 19. For the reasons that follow, however, I believe that the government's arguments are unpersuasive.

First, as to the notion of generalized harm based on the purported cumulative effect of false claims, as previously noted, there is nothing in the Act's text that limits its application to situations in which there is a significant risk of damage to the reputation and meaning of awards. The Act requires only that false statements concerning military awards be made. Thus, it is far from clear that there would be any appreciable harm in particular instances that could be cumulated to establish a generalized harm.

Furthermore, the government's reliance on the example of obscenity is unavailing. Specifically, the government asserts that the kind of harm caused by false claims related to military honors, "like the harm caused by obscenity, is difficult to prove in an individual case," thus "Congress may rely on the common-sense judgment that such speech is, in general, harmful." *Id.* at 20. However, the analogy to obscenity is old hat. Government officials frequently invoke this analogy to justify speech restrictions, and the Supreme Court regularly rebukes it.

45

*See, e.g., Brown*, 131 S. Ct. at 2734 ("*Stevens* was not the first time we have encountered and rejected a State's attempt to shoehorn speech about violence into obscenity.").

More to the point, the historical record—which provides a recognized, valuable guidepost in discerning categories of protected and unprotected speech, *see Stevens*, 130 S. Ct. at 1584—makes the government's analogy inapposite. Obscenity may be targeted without a particularized showing of harm because of our nation's long-standing restrictions on obscene speech. *See Roth v. United States*, 354 U.S. 476, 482–84 (1957) (reviewing obscenity laws pre- and post-dating adoption of the First Amendment and concluding that "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance"); *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61–62 & n.12 (1973). For First Amendment purposes, then, the relevant historical category that is lacking in protection is obscenity itself, not *injurious* obscenity. False-statement regulation, by contrast, has a different historical pedigree. The "naked lie" traditionally was not sanctionable, and legal consequences attached only if a false statement caused a particularized injury, or posed a significant risk of causing one. Thus, the relevant historical category that is lacking protection in this context is not false statements themselves, but rather only *injurious* false statements. In other words, particularized harm (or a significant risk of it) is part of the equation in the false-statement context, and not

46

in the obscenity context, because history dictates that result. The government's attempt to elide the distinction is unpersuasive.

The government's reliance on the example of perjury serves it no better. It is true that perjury does not involve, or does not exclusively involve, an identifiable victim. As noted, when a perjurous statement is uttered, not only the processes, but also the *integrity* of the judicial system is thought to be harmed. *Holland*, 22 F.3d at 1047 ("Perjury, regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system as well as to private individuals."). But an analogy to perjury statutes cannot support the Stolen Valor Act either.

The proscription of perjurous statements is limited to a very specific setting—testimony under oath in judicial or other legal proceedings, where the ascertainment of truth is critical to the administration of justice. *See In re Michael*, 326 U.S. 224, 227 (1945) ("All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore it cannot be denied that it tends to defeat the sole ultimate objective of a trial."). Moreover, liability for perjury requires that the falsely asserted fact relate to a material matter. *See* 18 U.S.C. § 1621(1); Model Penal Code § 241.1; 4 Blackstone, *supra*, at *137 ("[The perjurous statement] must be in some point material to the question in dispute; for if it only be in some trifling collateral circumstance, to which no regard is paid, it is no[t] . . . penal[ized] . . . .").

47

Materiality means that a false utterance has an actual or potential adverse effect on the proceeding. *See* Model Penal Code § 241.1(2) ("Falsification is material . . . if it could have affected the course or outcome of the proceeding."). The materiality requirement of perjury law ensures that liability will not be imposed for a false statement of fact—even one knowingly made, with an intent to deceive—unless there be actual harm or a significant risk of it.[20] The are no similar factors restricting the universe of statements that may be criminalized under the Stolen Valor Act.

## D.

In sum, the Stolen Valor Act does not adequately train its gaze on the injurious falsehood. The Act's simple and expansive wording ensures that a false representation—no matter how trivial it is—is punishable, without a showing of injury, or a significant risk of it. More specifically, the Act does not require a showing that a defendant's false statement of fact caused a particular injury; it is not designed in a manner that is calculated to target any form of indirect injury;

---

[20]    Consequently, the majority's attempt to liken the Stolen Valor Act to perjury statutes, *see* Maj. Op. at 33, is unavailing: the statutes that the majority cites, 18 U.S.C. §§ 1621 and 1623, both have materiality elements. Furthermore, the majority's suggestion that perjury allows for the criminalizing of false statements, "even if there is no harm to the tribunal or inquiry," Maj. Op. at 33, overlooks the fact that, irrespective of whether the tribunal or inquiry is actually misled by the perjurer's false statements, those statements have directly harmed the integrity of the judicial system.

48

and the government's argument that the false claims that the Act criminalizes inflict a generalized harm on the "reputation and meaning" of military awards is unpersuasive.

## VI.

Because in my view the Stolen Valor Act does not benefit from a categorical exception to the First Amendment, it seeks to regulate protected speech. Moreover, because the Act punishes "false[] represent[ations]" of having received a military medal, it restricts speech based on its content and subject matter, *see Consol. Edison*, 447 U.S. at 536, and based on disapproval of "the message it conveys," *Hill*, 530 U.S. at 719 (quoting *Ward*, 491 U.S. at 791) (internal quotation marks omitted). Accordingly, the Act must be subjected to strict scrutiny. *See Brown*, 131 S. Ct. at 2738.

To weather this exacting standard, the Act must be "justified by a compelling government interest" and be "narrowly drawn to serve that interest." *Id.* (citing *R.A.V.*, 505 U.S. at 395). In addition, the Act must be "actually necessary" to achieving the government's objectives. *Id.*; *see R.A.V.*, 505 U.S. at 395. It must be, in other words, the "least restrictive means to further the articulated interest." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). The presence of an adequate, less speech-restrictive alternative will render the Act constitutionally dubious, "casting considerable doubt on the government's protestations that the asserted justification is in fact an accurate

description of the purpose and effect of the law." *R.A.V.*, 505 U.S. at 395 (quoting *Burson v. Freeman*, 504 U.S. 191, 213 (1992)) (internal quotation marks omitted); *accord Reno*, 521 U.S. at 874 ("Th[e] burden on . . . speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.").

It is axiomatic that we may affirm a district court's judgment on any ground supported by the record. *See United States v. Sandia*, 188 F.3d 1215, 1217 (10th Cir. 1999) ("[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (alteration in original) (quoting *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1495 n.1 (10th Cir. 1992)) (internal quotation marks omitted)); *see also EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1043 n.14 (10th Cir. 2011) ("[W]e ultimately affirm on an alternate ground supported by the record."). Unlike the district court, I would not definitively opine on whether the Stolen Valor Act seeks to vindicate compelling governmental interests because under my view, even assuming that it does, the government cannot prevail. I would conclude that the Act is neither narrowly tailored to the asserted interests nor necessary to achieve them. Accordingly, I would find the Act unconstitutional and would affirm the district court's dismissal of the information against Mr. Strandlof.

**A.**

The long-form title of the Stolen Valor Act and the accompanying congressional findings offer insight into the Act's purpose. It is entitled, in full, "An Act [t]o amend title 18, United States Code, to enhance protections relating to the reputation and meaning of the Medal of Honor and other military decorations and awards, and for other purposes." *See* Pub. L. No. 109-437, 120 Stat. 3266, 3266 (2006). Section 2 of the Act contains the findings of Congress, including that "[f]raudulent claims surrounding the receipt of [military decorations and medals] . . . damage the reputation and meaning of such decorations and medals" and that "[l]egislative action is necessary to permit law enforcement officers to protect the reputation and meaning of military decorations and medals." *Id.* § 2.

In its briefs, the government offers two justifications for the Act. Echoing Congress's findings, it states first that "[t]he government has an important interest in protecting the reputation and value of military honors." Aplt. Opening Br. at 22. In this vein, it notes that "the government's ability to bestow public honor on an extraordinary few is undermined if, because of a multitude of imposters and false claims, people come to doubt that anyone's claims are true" and that "the government's expressions of gratitude to a distinguished few by means of a medal may appear insincere if the government does nothing to prevent liars and fraudsters from stealing the honor that belongs exclusively to the true recipients of the award." *Id.* Second, we are told that Congress has an "interest in

51

protecting the public from being deceived by imposters seeking to take advantage of the respect and credibility that military awards confer." Aplt. Reply Br. at 17; *see also* Aplt. Opening Br. at 24 ("Congress also has an interest in protecting the public from the attempts of military imposters to misappropriate the benefits and privileges of having received a military honor.").[21]

I assume without deciding that these interests are compelling ones. "It is not the [government's] ends, but its means, to which [I] object." *Johnson*, 491 U.S. at 418. In my analysis below, I follow the Supreme Court's lead and evaluate the government's articulated interests separately as they relate to the challenged statute. *See id.* at 407–11; *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2824–28 (2011); *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2668–72 (2011). I conclude (1) that with respect to the government's interest in protecting the "reputation and value of military honors," the government has failed to show that the Act is the least restrictive means of effectuating that interest, and (2) that with respect to the government's interest in protecting the public from imposters who "take advantage of the respect and

---

[21] The government has abandoned its argument before the district court that "[d]iluting the meaning or significance of medals of honor . . . could impact the motivation of soldiers to engage in valorous, and extremely dangerous, behavior on the battlefield." *See Strandlof*, 746 F. Supp. 2d at 1190 (alteration in original) (quoting Gov't Resp. to Amicus Br. of Rutherford Inst. at 12 (Dist. Ct. Dkt. # 31-3)) (internal quotation marks omitted). As with the interests that the government does pursue on appeal, I offer no definitive opinion on whether this interest is in fact compelling.

credibility that military awards confer," the Act is significantly overinclusive and thus not narrowly tailored to alleviating the alleged harm.

## B.

The government's first claimed interest is in protecting the reputation and status of military decorations—specifically, as symbols of honor, public esteem, and military merit, the reserve of a "distinguished few" who have risked and often sacrificed their lives on the nation's behalf.  *See* Aplt. Opening Br. at 22. Assuming, *arguendo,* that this interest is a compelling one,[22] I would hold that the

---

[22]    The Supreme Court has recognized both the significance of national symbols and the government's interest in protecting them:

> It cannot be gainsaid that there is a special place reserved for the flag in this Nation, and thus we do not doubt that the government has a legitimate interest in making efforts to preserve the national flag as an unalloyed symbol of our country.  We reject the suggestion, urged at oral argument . . . , that the government lacks any state interest whatsoever in regulating the manner in which the flag may be displayed.  Congress has, for example, enacted precatory regulations describing the proper treatment of the flag, *see* [4 U.S.C. §§ 5–9], and we cast no doubt on the legitimacy of its interest in making such recommendations.

*Johnson*, 491 U.S. at 418 (alteration omitted) (citations omitted) (quoting *Spence v. Washington*, 418 U.S. 405, 412 (1974), and Tr. of Oral Arg. at 38) (internal quotation marks omitted).  Protecting the integrity of military honors has been of central concern to our government and its leaders since the earliest days of the Republic. *See General Orders of George Washington* 30 (Newburgh, E. M. Ruttenber & Son 1883) (Order of Aug. 7, 1782) ("Should any who are not entitled to the [military] honors, have the insolence to assume the badges of them, they shall be severely punished.").  The Ninth Circuit concluded that the Stolen Valor Act was justified by Congress's "noble" and compelling interest in "preserving the integrity of its system of honoring our military men and women for their

(continued...)

53

government has not carried its burden to show that a criminal prohibition on false claims of military honor (even claims knowingly made with an intent to deceive) is the least restrictive means of furthering that interest.

Content-based restrictions on speech must be the "least restrictive means" available to the government. *Sable Commc'ns*, 492 U.S. at 126. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy Entm't*, 529 U.S. at 813. Mr. Strandlof posits that such an alternative is available here: that is, publication by the government of lists of true recipients of military honors in order to facilitate public exposure of imposters. *See* Aplee. Corr. Br. at 62. He points in particular to a government website listing all Medal of Honor recipients from 1863 to the present. *See* U.S. Army Center of Military History, *Medal of Honor*, http://www.history.army.mil/moh.html (last visited Jan. 6, 2012).

I find Mr. Strandlof's argument to be persuasive. The Supreme Court has often told us that "more speech, not enforced silence" is the "preferred First Amendment remedy." *Hartlage*, 456 U.S. at 61 (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)) (internal quotation marks omitted); *see also Johnson*, 491 U.S. at 419 ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of

---

[22](...continued)
service and, at times, their sacrifice." *Alvarez*, 617 F.3d at 1216.

education, the remedy to be applied is more speech, not enforced silence."

(quoting *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring)) (internal quotation

marks omitted)).[23] That remedy in this case was potent. When Mr. Strandlof's

prevarications were revealed, he quickly went "from hero to pariah," Aplee. Br. at

62, and the record is replete with newspaper articles excoriating Mr. Strandlof for

his deception, *see* Aplt. App. at 41–68. Moreover, it was the community who

exposed Mr. Strandlof's lies, after members of the organization he founded, the

Colorado Veterans Alliance, became suspicious of his claims, *searched military*

*records*, and contacted the FBI. *Id.* at 57.

In fact, there is a robust and nationwide grassroots effort aimed at rooting

out imposters like Mr. Strandlof. *See* Amy Chozick, *Veterans' Web Sites Expose*

*Pseudo Heroes, Phony Honors*, Wall St. J., May 6, 2005, at B1. For example, the

website POWnetwork.org maintains an extensive list of individuals making false

claims of military service and decoration. *P.O.W. Network's Phonies Index*,

---

[23] Indeed, the Supreme Court has suggested in a number of cases that the First Amendment requires greater tolerance of falsehood, even injurious falsehood, when the marketplace of ideas is adequate for the correction of error. *See, e.g.*, *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring). The Court has often resorted to this principle explicitly. In *Hartlage*, for example, the Court struck down a state law prohibiting false promises in the course of an election campaign. 456 U.S. at 61. It found that "[t]he preferred First Amendment remedy of 'more speech, not enforced silence,'" had "special force" in this context because "[i]n a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent." *Id.*

P.O.W. Network, http://pownetwork.org/phonies/list_of_names.htm (last visited Jan. 6, 2012).  More notable perhaps is the "Hall of Valor," a website maintained by Vietnam veteran Doug Sterner.  *Hall of Valor*, Military Times Hall of Valor, http://www.militarytimes.com/citations-medals-awards/ (last visited Jan. 6, 2012).  The American veterans' organization, AMVETS, calls the site "the most comprehensive database of military valor award citations available."  *See The Case for HR 666: The Military Valor Roll of Honor Act*, ReportStolenValor.org, http://www.reportstolenvalor.org (last visited Jan. 6, 2012).

"When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."  *Playboy Entm't*, 529 U.S. at 816.  The government, in my view, has not carried its burden here.  It first asserts that, "[a]s reflected in Congress's finding in support of the Act, the remedy of 'more speech' has proven to be an insufficient deterrent to prevent false claims of military awards."  Aplt. Opening Br. at 31.   But the congressional findings in Section 2 of the Act contain no such conclusion.  There is nothing in the legislative record suggesting that Congress even considered alternative mechanisms of combating false claims, much less concluded that such mechanisms were ineffective.  *See Sable Commc'ns*, 492 U.S. at 126, 129 (finding that a statute was not "narrowly drawn" so as to satisfy the First Amendment because "the congressional record contains no legislative findings that would justify us in concluding that there is no

56

constitutionally acceptable less restrictive means, short of a total ban, to achieve the Government's interest").

The government also suggests that a government database of award recipients would be inadequate because database records might be unclear and imposters may do significant harm before their lies are exposed. *See* Aplt. Opening Br. at 31. However, this argument says nothing about whether the publication of lists of true award recipients would be equally as effective as (and perhaps even more effective than) criminal sanctions at deterring false claims, or nipping them in the bud when they appear. Indeed, the government merely muses that "it is not at all clear that such a database would be as effective as criminal penalties in preventing false claims." Aplt. Reply Br. at 18 n.8. However, the government carries the burden of proof on the least-restrictive-means inquiry and such empty musings—which, at most, suggest the *possibility* that a database would not be as effective as criminal sanctions—are not sufficient to carry its burden. Without more, and particularly in light of the growing universe of online military-award lists, I am not persuaded that "more speech" is not an adequate alternative to achieve the government's interest in preserving the reputation and meaning of military honors.

I would stress the narrowness of this conclusion. Congress might very well determine that the proposed database alternative is an inadequate remedy to what Judge Bybee has termed the "epidemic" of military imposters, *Alvarez*, 617 F.3d

57

at 1239 (Bybee, J., dissenting), and that a criminal penalty is in fact necessary to combat false claims and preserve the reputation and status of military awards. Those judgments would be entitled to considerable weight by the courts, *see Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195–96 (1997), particularly in light of Congress's traditionally broad legislative authority over military affairs, *see United States v. O'Brien*, 391 U.S. 367, 377 (1968) ("The constitutional power of Congress to raise and support armies and to make all laws necessary and

proper to that end is broad and sweeping.").[24]  On the present record, however, I

believe the government has failed to make the required showing.

## C.

The government also asserts an interest in "protecting the public from being

deceived by imposters seeking to take advantage of the respect and credibility

that military awards confer."  Aplt. Reply Br. at 17.  To the extent that the

government is articulating an interest in combating fraud—for example,

preventing a defendant from deriving a distinct material benefit, or from

---

[24]      In this regard, in a footnote in its reply brief, Aplt. Reply Br. at 18
n.8, the government points to a 2009 Department of Defense report to Congress
that recommended against the kind of database that Mr. Strandlof proposes on the
ground that such a database would be insufficiently complete and of limited
utility because federal law would prohibit publication of certain identifying
information about true award recipients.  *See* Report to the Senate and House
Armed Services Committees on a Searchable Military Valor Decorations Database
(March 2009), *available at*
http://www.reportstolenvalor.org/pdf/DoD-DB-Report-04-02-2009.pdf.

Putting aside the fact that any line of argument predicated on this report
would come too late because the government did not reference it until its reply
brief, *see, e.g.*, *United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. 2004)
("The failure to raise an issue in an opening brief waives that issue."); *Carpenter
v. Boeing Co.*, 456 F.3d 1183, 1198 n.2 (10th Cir. 2006) (noting that "we
particularly frown on the making of new arguments in a party's reply brief"), the
government does not assert that, at any time, Congress has affirmatively endorsed
the report's recommendation—which was issued, in any event, *after* the passage
of the Stolen Valor Act—and, therefore, the report's recommendation under no
circumstances should be accorded the level of deference in our present analysis
that we have customarily extended to congressional findings.  The report's
recommendation is not of sufficient persuasive force to alter our conclusion here
regarding the government's failure to carry its burden in the least-restrictive-
means analysis.

59

perpetrating through reliance a distinct harm, by his false claim—this is plainly

an interest that would justify a criminal penalty, as the history and continued

existence of criminal fraud laws suggests. *See Telemarketing Assocs.*, 538 U.S. at

612–13 (stating that "fraud[] . . . is unprotected speech," that "fraud prevention

ranks as a substantial governmental interest," and that "[f]rauds . . . may be

denounced as offenses and punished by law" (alteration omitted) (quoting *Village

of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 636 (1980), and

*Schneider v. Town of Irvington*, 308 U.S. 147, 164 (1939)) (internal quotation

marks omitted)); *Donaldson*, 333 U.S. at 190 (the government's power "to protect

people against fraud" has "always been recognized in this country and is firmly

established").

In part, the Stolen Valor Act seems to have been enacted with fraud in

view. *See* 151 Cong. Rec. S12684-01, S12688 (Nov. 10, 2005) (statement of Sen.

Conrad) ("These imposters use fake medals—or claim to have medals that they

have not earned—to gain credibility in their communities. These fraudulent acts

can often lead to the perpetration of very serious crimes."); *id.* at S12689 ("We

must never allow [recipients'] service and sacrifice to be cheapened by those who

wish to exploit these honors for personal gain."). And newly proposed legislation

in Congress, dubbed the Stolen Valor Act of 2011, is calibrated to that purpose,

criminalizing misrepresentations of military honor made knowingly and "with

intent to obtain anything of value" that is of more than "de minimis" worth.

60

Stolen Valor Act of 2011, H.R. 1775, 112th Cong. § 2(a) (2011), *available at* http://heck.house.gov/sites/heck.house.gov/files/Stolen%20Valor%20Bill.pdf.

The problem for the government, however, is that the Stolen Valor Act is not a narrowly tailored effort to combat fraud. Even when the government pursues permissible ends, if the means impinge on First Amendment rights, then they must be "neither seriously underinclusive nor seriously overinclusive." *Brown*, 131 S. Ct. at 2741–42. The Act, in my view, suffers a serious overinclusiveness problem. By its terms, the Act has no *mens-rea* requirement at all, much less one that is narrowly tailored to attack fraud. Even assuming, *arguendo*, that the majority's limiting construction of the Act is permissible—such that the statute's reach is restricted to false statements that are knowingly made, with an intent to deceive—the Act still does not require the government to prove that the defendant uttered the false statement with the intent to secure reliance—for example, with the intent to obtain something of more than a de minimis value, as found in the proposed Stolen Valor Act of 2011. Therefore, I am hard-pressed to see how the Act realistically could operate to combat fraud. *Cf. Telemarketing Assocs.*, 538 U.S. at 620–21 (describing elements of fraud under state law, including a knowingly false statement made "with the intent to mislead the listener, *and* succeeded in doing so" as "[e]xacting proof requirements" that "provide[d] sufficient breathing room" for the First Amendment and were "properly tailored" to the government's interest in fraud

61

prevention (emphasis added)); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) ("[The words 'to defraud'] usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching.").  Furthermore, I do not believe it would be appropriate to employ the doctrine of constitutional avoidance to read an intent-to-defraud element into the Act, because it is not "readily susceptible" to such a saving construction.  *Stevens*, 130 S. Ct. at 1592 (quoting *Reno*, 521 U.S. at 884) (internal quotation marks omitted).  Not even the majority suggests that this would be appropriate.  And, in more statutes than I could reasonably catalog, when Congress meant to include the *mens-rea* element of intent to defraud, it did so in express terms.  *See, e.g.*, 18 U.S.C. § 38(a)(1)(A) ("intent to defraud" regarding "any aircraft or space vehicle part"); *id.* § 152(1) ("knowingly and fraudulently conceals . . . any property belonging to the estate of a debtor" in bankruptcy proceedings); *id.* § 471 ("intent to defraud" regarding "any obligation or other security of the United States").  Thus, the absence in the Stolen Valor Act of a *mens-rea* requirement narrowly tailored to attack the fraud that may arise from false claims relating to military awards "is alone enough to defeat it."  *See Brown*, 131 S. Ct. at 2740.

## D.

The Stolen Valor Act does not survive strict scrutiny.  The government has failed to show that a criminal penalty is the least restrictive means of achieving its interest in protecting the symbolic importance of military awards.

62

Furthermore, the Act is not a narrowly tailored effort at fraud prevention: by its terms it contains no *mens-rea* requirement at all and the one that the majority purports to engraft onto the statute does not succeed in making the Act narrowly tailored to combat fraud.

* * *

Based on the Supreme Court's false-statement jurisprudence, the historical record, and bedrock First Amendment principles, I dissent from the majority's opinion and would hold that the injurious falsehood is the "historic and traditional categor[y]," *Stevens*, 130 S. Ct. at 1584 (quoting *Simon & Schuster*, 502 U.S. at 127) (Kennedy, J., concurring in the judgment)) (internal quotation marks omitted), that warrants a categorical exception to the First Amendment's rigorous, protective requirements. The Stolen Valor Act, in my view, does not qualify for the exception because it does not target those falsehoods that cause, or pose a significant risk of causing, injury—whether that injury be to individuals or to governmental processes. Being a content-based restriction on speech, the Act therefore must survive strict scrutiny, which it fails to do. The government has not adequately justified the need for a criminal prohibition to effectuate its interest in protecting the symbolic importance of military awards, and the Act is not a narrowly tailored effort at fraud prevention because it lacks a *mens-rea* requirement that would advance this objective. I would therefore affirm the

63

district court's order striking down the Stolen Valor Act as an unconstitutional

abridgment of the freedom of speech.